**In the Matter of the Arbitration between PROODOS MARINE CARRIERS COMPANY, as Disponent Owner of the M.V. GOOD HUNTER, Petitioner,**

**and**

**OVERSEAS SHIPPING AND LOGISTICS, Respondent.**

**No. 83 Civ. 9248–CSH.**

United States District Court,
S.D. New York.

Jan. 9, 1984.
As Amended Jan. 19, 1984.

Healy & Baillie, New York City, for petitioner; Howard M. McCormack, New York City, of counsel.

Nourse & Bowles, New York City, for respondent; David A. Nourse and Shaun F. Carroll, New York City, of counsel.

MEMORANDUM OPINION
AND ORDER

HAIGHT, District Judge:

This case arises on petitioner's motion to compel arbitration, and respondent's cross-motion to confirm a prior partial award of an arbitration panel, fill a vacancy in that panel, and restrict the issues which may come before the panel in future. The case

was originally assigned to Judge Cannella. In his temporary absence from court, it came to the undersigned sitting in Part I because the circumstances required prompt resolution. Those circumstances involve imminent dates for voyages to be performed under the contract which forms the subject matter of the action.

Petitioner is Proodos Marine Carriers Company ("Proodos"). Respondent is Overseas Shipping and Logistics ("OSL"). On June 23, 1983, at Houston, Texas, Proodos and OSL entered into a written "Liner Booking Note" which is in effect a maritime contract of affreightment. The contract called for OSL to furnish a series of cargoes of polyethelene pipe in bundles for carriage in vessels to be supplied by Proodos from Houston to Richards Bay, South Africa. Within the context of the contract of affreightment Proodos may be regarded as the shipowner (although it chartered the vessels in), and OSL as the charterer.

Special term (D) of the contract provides: "Cargo to be moved in three or four shipments, charterer's option but not less than minimum 1,920 cubic meters each shipment."

The face of the contract provides that the first shipment will take place about July 14, 1983 and the last shipment by February 28, 1984.

The calculation of freight money is specified in Clauses 9 and 10. Clause 9 provides in part:

"Pipe to be freighted on the net actual cube of the largest pieces per bundle."

Clause 10 of the contract provides:

"US Dlrs 42.00 per net cubic meter full berth terms hook to hook. Freight to be fully prepaid within 7 working days of signing/releasing bills of lading, vessel and/or cargo lost or not lost."

Special term (J) provides:

"Should any dispute arise between Owners and the Charterers, the matter disputed shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision, or that of any two of them, shall be final, and for the purpose of enforcing any award this agreement may be made a rule of the Court. The Arbitrators shall be commercial men."

Proodos nominated the motor vessel GOOD HERALD to lift the first cargo under the contract. She loaded in Houston in July, 1983. A dispute instantly arose. A narrow description of that dispute would be to say that Proodos refused to deliver on-board bills of lading to OSL. But that refusal was triggered by, and inextricably intertwined with, a dispute about how freights should be calculated. From the record before me, it appears that Proodos contended freights should be calculated on gross cubic measurement of the cargo, whereas OSL contended the calculation should be on the basis of net cubic measurements. Counsel at oral argument did not have a full technical grasp of the meaning of these terms. Nor, I confess, do I. "Net cubic measurement" appears to exclude the packaging of the pipes. But it is not necessary to define these terms precisely. What is significant is that "gross cubic measurement" results in significantly higher freight revenues than does "net cubic measurement." In the dispute arising out of the GOOD HERALD loading, Proodos insisted upon "gross cubic measurement"; consequently calculated a higher amount of freight than did OSL; demanded that the bills of lading be claused to reflect deadfreight (which OSL refused to accept because of the adverse effect upon the bills' negotiability); and refused to release the bills of lading when OSL insisted upon its net cubic measurement and consequent lower amount of freight.

The parties moved promptly to resolve this dispute by arbitration. OSL nominated as its arbitrator Mr. John F. Ring, Jr. Proodos's agent, American Maritime Agencies, nominated Mr. Alan H. Harley. Messrs. Ring and Harley selected as the panel chairman Mr. Eugene T. James. I shall upon occasion refer to this arbitration panel as the "James panel." All three individuals were qualified commercial men.

No suggestion is made by Proodos on these motions that at the pertinent time American Maritime Agencies was not authorized to act on its behalf in appointing Mr. Harley as an arbitrator, or in communicating with the arbitration panel when the panel had been formed. On the contrary, such authority was specifically conceded by counsel for Proodos at the argument.

The arbitration panel convened a hearing on August 15, 1983. Proodos, although informed through its agent of the date, time and place of the hearing, chose for reasons not revealed by the motion papers not to send a representative. It is right to say at this juncture that Proodos was not represented at that time by the able and experienced admiralty counsel who appear for it on these motions. OSL was represented at the arbitration hearing by its vice-president, Gary W. Strom. Strom presented to the arbitrators an unsigned submission agreement which described the submitted dispute as follows:

"The dispute submitted to the arbitrators is whether Overseas Shipping & Logistics, Inc. is entitled to have its proposed bills of lading signed and delivered to them by or on behalf of Proodos Marine Carriers Company in accordance with the terms of the booking note and rider for the goods presently carried aboard the 'Good Herald' and when and where the bills of lading should be so delivered, and all issues relating to the delivery of the bills of lading for said cargo including all costs, damages and interest payable in connection with arbitration of this dispute."

The record of the arbitration hearing makes it clear enough that OSL had prepared this submission agreement. Tr. 6.

Strom then made a presentation on behalf of OSL. He described the dispute which had arisen between the parties, culminating in the refusal of Proodos to release the bills of lading. The bill of lading dispute was inextricably bound up with the proper calculation of freight, as Strom's presentation made clear:

"The Owners denied the release of the bills of lading and demanded that the freight be paid prior to the release of the bills of lading. They requested the additional sum of 68,669.12 be put in escrow as a difference in ocean freight as calculated by the Owner, stating that they were going to perform a survey at Richards Bay, the destination port of the cargo, and submit a claim subject to arbitration depending upon the outcome of the survey in Richards Bay.

"We answered their Telex on that same date, August 3rd, stating that we had no figures or calculations from the Owner as to what discrepancy occurred. We stated in that Telex exactly how the actual cubic of the cargo was calculated. We further stated that this cubic could be verified through the kirk's [sic] tallies and the stevedores, as they were provided all the information. We again demanded that freight be prepaid within 7 days of signing releasing bills of lading as called for in the booking note." Tr. 10–11 (The word "kirk's" in the transcript is presumably a stenographer error. The word undoubtedly should be "clerk's." There is no evidence of the intervention of the Scots Presbyterian Church in the case.)

The arbitrators heard Strom's presentation, asked him questions, examined the submitted documents, and retired to consider their award. OSL prevailed. Panel chairman James announced on the record that the panel intended to issue a "partial final award." He said:

"The Panel has unanimously concluded that the Owners are hereby directed to immediately release bills of lading as presented by Overseas Shipping and Logistics Inc.

"The Panel stands ready to hear evidence pertaining to additional freight and/or damage claims by either party." Tr. 35.

That award was conveyed by telex to the parties. The rapid convening of the panel and its resolution of the dispute, while the underlying transaction was still in

progress, reflects the working of commercial arbitration at its best.

The arbitrators set forth the reasons for their oral award of August 15, 1983 in a written "partial final award" dated September 30. The award concludes:

"The panel has reviewed the evidence and documents and unanimously concludes, that the Owners should not have withheld the signing and releasing of the Charterers' Bills of Lading as presented. Clauses 9 and 10 are very clear regarding the net cubic meter aspects of the stowage and payment of freight. Therefore, the Owners are hereby directed to immediately release the Bills of Lading as presented by Overseas Shipping and Logistics Inc. The panel also stands ready to hear evidence pertaining to additional freight and/or damage claims by either party."

It is this award which OSL by its cross-motion now seeks to confirm.

Because of the prompt arbitration hearing and award, and Proodos's immediate issuance of bills of lading in obedience to the award, the cargo described by the bills of lading was transported without delay or further incident. In consequence, OSL suffered no monetary damages, and no further claims have arisen out of the loading of the GOOD HERALD.

One would have thought that the arbitrators' clear and unambiguous resolution of a precisely defined issue would have put paid to Proodos's rejected method of calculating freights due under the contract. However, the dispute flared up again on the occasion of the second loading, this time into the M/V GOOD HUNTER in November of 1983. The cargo having been loaded into the vessel, Proodos again refused to issue clean bills of lading, giving the same justification: the failure of OSL to agree to Proodos's calculation of freight. To permit completion of the voyage, OSL placed a sum of money into escrow as security for Proodos's claim for additional freight, and Proodos issued the bills of lading.

In order to address this renewed dispute, Proodos appointed Mr. Klaus Mordhurst as its arbitrator in what Proodos conceived to be the commencement of new arbitration proceedings. On November 22, 1983, Mr. Harley, the arbitrator first nominated by Proodos and a member of the panel headed by Mr. James, announced that he was withdrawing from further participation in the case because differences had arisen between Proodos and his own company. OSL took the position that the James arbitration panel should hear the dispute arising out of the GOOD HUNTER voyage, and that Mr. Mordhurst should replace Mr. Harley as Proodos's arbitrator on that panel. Proodos, now represented by counsel, disputed that view and moved in this Court to compel OSL to appoint an arbitrator to a new arbitration panel, upon which Mr. Mordhurst would serve as Proodos's arbitrator. At this point OSL cross-moved to confirm the partial award of the James panel; to designate Mr. Mordhurst as Proodos's arbitrator on that panel; and for an order:

"... limiting the scope of all further arbitration proceedings between the parties arising out of the Booking Note Contract dated June 23, 1983 to issues *other than* the payment of freight on the basis of net versus gross cubic measurement of cargo and petitioner's [Proodos] obligation to issue clean bills of lading prior to the payment of freight..." (emphasis in original).

■ The substantive question presented by these motions is the continuing effect, if any, of the James arbitration panel's award, rendered orally on August 15, 1983 and reiterated in writing on September 30. OSL's final prayer for relief which I have quoted *supra* constitutes an invocation of the doctrine of *res judicata*. Proodos's counsel conceded at oral argument that *res judicata* may be triggered by an arbitration award, and that the effect of the doctrine in a given case is for the Court to decide, and not arbitrators. There is respectable authority for both these propositions, *Alkes Shipping Corporation v. Amoco Trading International, Ltd.*, 80 Civ. 5555 (S.D.N.Y., June 19, 1981) (Leval, J.). I so hold in the case at bar.

I also conclude without difficulty that OSL is entitled to the relief it seeks in respect of foreclosure of issues. Proodos argues that the only dispute submitted to the James panel and resolved by it was OSL's entitlement to release of the bills of lading on the GOOD HERALD loading. It follows, the argument continues, that the underlying issue of proper freight calculation has never been addressed.

There is no substance to the argument. As noted, Proodos's obligation to issue clean bills of lading and OSL's right to receive them depended solely upon the proper calculation of freight. Only if Proodos was correct in its gross cubic calculation was it entitled to withhold the bills of lading until they had been claused for deadfreight, or otherwise refuse to deliver them to OSL. The arbitrators' direction to Proodos to deliver the bills of lading immediately necessarily resolved the underlying issue of freight calculation in OSL's favor. It is not necessary to reason that this is implicit in the arbitrators' oral award on August 15, 1983. The arbitrators said so explicitly in their written award of September 30.

Counsel for Proodos complained at the oral argument that Proodos had not yet presented its arguments to the arbitrators on the merits of its freight calculation. The argument was put forward rather faintly. Proodos cannot in any event be heard to make it. The James panel tendered Proodos an opportunity to appear before it and make a presentation. Proodos declined to do so. Having spurned the opportunity to participate in a full and fair hearing on the dispute, Proodos is bound by the result.

In consequence, the principle of *res judicata* applies. The issue of proper freight calculation has been conclusively determined by the James panel. That award forecloses any further dispute on the point during the lifetime of the contract. Proodos is barred by *res judicata* from arguing that its freight calculation is correct, and that of OSL incorrect. *Res judicata* would foreclose Proodos's argument, whether presented to a reconvened James panel or to a different panel of arbitrators. *Res judicata* is a broad rule of repose. Its effect does not depend upon an adjudicated result being presented again to the same tribunal.

■ The procedural question that arises is whether the James panel still exists. As a general rule, once an arbitration panel decides the submitted issues it becomes *functus officio* and lacks any further power to act. "The rationale underlying this rule is to prevent re-examination of an issue by a nonjudicial officer potentially subject to outside communication and unilateral influence." *A/S Siljestad v. Hideca Trading, Inc.*, 541 F.Supp. 58, 61 (S.D.N.Y. 1981), *aff'd*, 678 F.2d 391 (2d Cir.1982). An illustration of that particular application may be found in *Salt Lake Pressmen and Platemakers, Local Union No. 28 v. Newspaper Agency Corp.*, 485 F.Supp. 511 (D.Utah 1980). But that is not the issue presented by the case at bar. Neither party seeks directly to cause the arbitrators comprising the James panel to undo or modify their award. Nor have the arbitrators undertaken to do so themselves. The present issue may be posed thus. Where a continuing contract of affreightment containing a broad arbitration clause gives rise, in its initial stages, to disputes, and arbitrators are selected to resolve those disputes and do so, and thereafter further disputes arise during performance of the contract, should the previously selected arbitration panel be regarded as still in existence for the purpose of resolving the subsequent disputes?

The issue must be posed in these terms because I am bound to accept Proodos's argument that the James panel has made a final award on all the disputes initially submitted to it. The only disputes, actual or potential, submitted to arbitration in August, 1983 related to the first loading under the contract of affreightment, that involving the GOOD HERALD. The actual disputes submitted were the proper calculation of freight on that voyage and OSL's entitlement to immediate release of the

bills of lading for that voyage. The potential additional disputes involved OSL's claims for compensatory damages on that voyage. Happily those potential claims were mooted by Proodos's prompt compliance with the arbitrators' self-styled "partial final award." Thereupon the award became final in respect of all disputes. The submission agreement drafted by OSL which I have quoted *supra* is clearly limited to the cargo loaded on board the GOOD HERALD. That is, of course, hardly surprising, since the GOOD HERALD was the only vessel that had been tendered under the contract at the time of the submission.

 While I have found no case directly in point and the parties cite none, I conclude that it would be mischievous and counterproductive of commercial arbitration's salutary purpose of prompt dispute resolution to hold that the James panel no longer exists. On the contrary: I hold that where a long-term contract contains a broad arbitration clause, and early-arising disputes are submitted to and resolved by an arbitration panel selected in accordance with the contract, that panel remains in office for the purpose of resolution of later-arising disputes during the course of the contract.

This holding does not do violence to the rationale of the *functus officio* doctrine, which as noted addresses an entirely different problem. But the retention in office of arbitrators familiar with the underlying contract and prior disputes will promote prompt resolution of subsequent disputes. To hold otherwise would require selection of a new panel every time additional disputes arose within the context of an on-going contract. That clumsy requirement would permit a party acting in bad faith to obstruct the arbitral process by delaying the appointment of its own arbitrator, or the selection of the panel chairman, each time new disputes arose. I do not suggest for a moment that either party is so motivated in the case at bar. But Fabian tactics are familiar enough in cases of this nature.

It follows that the James panel still exists for the purpose of resolving disputes arising out of this contract of affreightment. It further follows that Proodos's motion to compel arbitration has no substance. OSL has previously complied by its appointment of Mr. Ring. And it further follows that by reason of the withdrawal of Mr. Harley, Proodos is presently unrepresented by an arbitrator on the James panel. I fill that vacancy, pursuant to the power vested in me by the Federal Arbitration Act, 9 U.S.C. § 5, by appointing Mr. Klaus Mordhurst as Proodos's arbitrator. Mr. Mordhurst, as noted, is the arbitrator selected by Proodos within the context of the latter's motion to compel.

In short: Proodos's motion to compel arbitration is denied. OSL's cross-motion for assorted relief is granted in its entirety.

Settle order and judgment on notice.