**BLUE TEE CORP.,** Appellant,

v.

**KOEHRING COMPANY and United Dominion Industries, Inc., (formerly known as AMCA International Corp.),** Appellees.

No. 1540, Docket 93–7033.

United States Court of Appeals, Second Circuit.

Argued May 28, 1993.

Decided July 21, 1993.

**634**

Ambrose M. Richardson, III, New York City (Richardson & Mahon, P.C., James J. Mahon, Stephen J. Fraher, of counsel), for appellant.

Warren H. Colodner, New York City (Lord Day & Lord, Barrett Smith, David Simon, of counsel), for appellees.

Before: FEINBERG and NEWMAN, Circuit Judges, and KELLEHER, District Judge.[*]

FEINBERG, Circuit Judge:

This appeal, which grows out of a fairly typical business deal, makes one wonder about the alleged speed and economy of arbitration in resolving commercial disputes. Thus far, the parties have been involved for over three years in three separate district court actions, two arbitrations and this appeal; in addition, one party seeks still further arbitration. As will be seen below, we think it is time to call these proceedings to a halt.

Blue Tee Corp. (Blue Tee) appeals from a final judgment entered in January 1993 in favor of appellees Koehring Company and United Dominion Industries, Inc. (formerly known as AMCA International Corp.) (collectively AMCA) in the United States District Court for the Southern District of New York, Robert J. Sweet, J. The judgment confirmed an arbitration award issued by a three-member panel of the American Arbitration Association (AAA). The award was the culmination of a fiercely-contested pricing dispute under a contract between the parties. Blue Tee challenged the award in the district court. Judge Sweet concluded that the AAA panel had jurisdiction to resolve the dispute and confirmed the award. For the reasons stated below, we affirm.

Background

In May 1989, Blue Tee and AMCA entered into a purchase agreement (the Agreement) whereby Blue Tee was to purchase the inventory and intangible assets of AMCA's Speedstar Division, a manufacturer of drilling rigs, which was scheduled for liquidation. In the Agreement, the purchased assets were valued at $5 million, subject to adjustment based upon differences between the inventory at closing and the inventory carried on Speedstar's books of account as of the 1988 year end.

The provisions of the Agreement dealing with preliminary purchase price, purchase price adjustments, final purchase price, and resolution of disputes concerning purchase price adjustments were all set out in Section 3. Section 3.3 (entitled "Final Statement") dealt specifically with the valuation of inventory. Among other things, it contained a narrow arbitration clause requiring disputes regarding the computation of the final statement to be resolved by accountants, with the names of preferred firms (including Arthur Andersen) actually mentioned.[1] In addition

---

[*] Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

1. The arbitration clause contained in Section 3.3 provided in relevant part:

> In the event that Buyer shall disagree with the computation of the Final Statement by Seller, each specific item of disagreement shall be set forth in writing by Buyer and delivered to Seller within thirty (30) days of the receipt by Buyer of the Final Statement. If Buyer and

to the narrow arbitration clause in Section 3.3, the Agreement contained a general arbitration clause. Section 12.15 provided that

> [a]ny dispute, controversy or claim arising out of or in connection with or relating to this Agreement or any breach or alleged breach thereof, shall be determined and settled by arbitration in the City of New York pursuant to the rules then in effect of the American Arbitration Association.

The story of this dispute, in brief, is as follows. By its terms, Section 3.1 of the Agreement (entitled "Preliminary Statement") called for AMCA to prepare a preliminary statement, using inventory values as of a specified date, "on a basis consistent with the principles used in preparing the normal month end balance sheets," i.e., discounted book value. The crucial dispute between the parties was whether, as AMCA claimed, the Agreement was amended at the last minute to provide for a method of valuing inventory different from the one specified in Section 3.1. According to AMCA, the parties agreed that inventory would be valued not on discounted book value (as the terms of Section 3.1 required) but on another method involving categories of "good" and "bad" inventory, and the revisions in value caused by this last-minute amendment were reflected in the preliminary statement. On this basis, the preliminary statement called for Blue Tee to pay $3,159,000 on account, pending adjustment based on inventory values as of the closing.

Blue Tee paid the preliminary price by wire transfer. Later, AMCA claimed that by paying the preliminary price, Blue Tee effectively waived the provisions of Section 3.1 and implicitly accepted AMCA's valuation method, whereas Blue Tee claimed that it was bound only by the unamended Agreement, that it had not agreed to any last-minute changes in the Agreement and that it had paid the preliminary price since it

seemed "about right" and was subject to adjustment.

At the required time, AMCA supplied a final statement based on the same valuation method it had used in the preliminary statement, with separate categories for good and bad inventory. In other words, the final statement, like the preliminary statement, was based on the assumption that the Agreement had been amended at the last minute. Thereafter, AMCA provided an amended final statement based on the same principles, which called for Blue Tee to pay an additional $492,000 (later reduced to $395,000). Blue Tee objected to the amended final statement, and, pursuant to the narrow arbitration clause contained in Section 3.3, the dispute was jointly submitted to the accounting firm of Arthur Andersen.

In the proceedings before Arthur Andersen, AMCA submitted evidence of the last-minute amendment and its effect on the valuation of inventory, and Blue Tee argued that the final purchase price was to be determined in accordance with Section 3 of the Agreement, regardless of last minute understandings as reflected in the preliminary statement. Arthur Andersen found that under a "literal interpretation" of Section 3 of the Agreement, i.e., assuming it had *not* been amended by the last-minute negotiation leading to the changes reflected in the preliminary statement, AMCA was required to pay Blue Tee $878,000 plus interest because Blue Tee had overpaid. But Arthur Andersen also expressly disclaimed competence to determine whether, as AMCA argued, the parties had amended the Agreement at the last minute, thereby materially affecting the valuation of inventory. AMCA then attempted to persuade Arthur Andersen to rule on what effect AMCA's position regarding the amendment would have on the value of the inventory, if AMCA's position were assumed to be valid. Blue Tee objected to any further rul-

---

Seller shall not within the next fifteen (15) days resolve each such item of disagreement, both shall immediately refer those items of disagreement to Price, Waterhouse & Co. (or, if such firm shall be unwilling or unable to act hereunder, Arthur, Anderson [sic] & Co., or if Arthur, Anderson [sic] & Co. shall also be unwilling or unable to act hereunder then to such other firm of independent certified public ac-

countants of recognized standing as Buyer and Seller shall mutually select) for resolution. Buyer and Seller shall request that such accountants determine the matters in dispute within thirty (30) days subsequent to such referral, in accordance with the accounting methods and procedures referred to in this Section 3, and such determination shall be conclusive and binding on the parties hereto.

ing by Arthur Andersen on the ground that its authority to arbitrate had ended. Arthur Andersen did nothing further.

AMCA then demanded AAA arbitration under Section 12.15 of the Agreement, requesting a determination of the amount of the purchase price on AMCA's theory— which Arthur Andersen had refused to decide—that the Agreement had been amended. AMCA's demand for arbitration claimed the specific amount of "$395,000 plus other amounts not yet determined." Blue Tee then filed two actions in the district court, one seeking to confirm the Arthur Andersen award and the other seeking to enjoin the AAA arbitration. AMCA opposed the relief sought in both actions. In *Blue Tee Corp. v. Koehring Co.* (*Blue Tee I* ), 754 F.Supp. 26 (S.D.N.Y.1990), Judge Sweet concluded that he was compelled to confirm the Arthur Andersen award because it was sufficiently final and definite within the meaning of the Federal Arbitration Act (the Act) and entered judgment accordingly. AMCA paid Blue Tee the full amount of the judgment. Some five months later, however, in *Blue Tee Corp. v. Koehring Co.* (*Blue Tee II* ), 763 F.Supp. 754 (S.D.N.Y.1991), Judge Sweet refused to stay the arbitration before the AAA on the issue of whether the Agreement had been amended at the last minute:

> The question remaining is whether the literal terms of [Section 3.1] standing alone constitute the complete agreement of the parties and should govern, or whether a dispute exists with respect to contract interpretation that involves determining the intention of the parties as evidenced by their words and deeds at the time they entered into their contract in the light of the parties' conduct in setting the preliminary price and amending the Preliminary Statement of the Purchase Agreement.

Id. at 756 (citations omitted).

Before the AAA arbitration began, AMCA amended its demand for relief to include the return of $1,077,137 (plus interest), which Judge Sweet had required AMCA to pay to Blue Tee pending the outcome of the AAA arbitration. In the arbitration proceedings before the AAA, AMCA presented evidence of the parties' understandings as to how the

final purchase price should have been determined. Blue Tee challenged that evidence and asserted various counterclaims. Blue Tee vigorously urged, among other things, that AMCA had improperly increased the price to Blue Tee by over $1 million.

After eight days of hearings, including testimony from six witnesses and extensive oral and written presentations by the parties, the AAA panel obviously accepted AMCA's interpretation of the Agreement, rejected a contrary interpretation presented by Blue Tee and ruled for AMCA. In sum, the AAA arbitrators concluded that: (i) a dispute existed with respect to the interpretation of the Agreement; (ii) they were empowered by Section 12.15 to resolve the dispute; (iii) Blue Tee owed AMCA $395,000 plus interest pursuant to the Agreement; (iv) Blue Tee should return the $1,077,137 (plus interest) that it received from AMCA as a result of Blue Tee's enforcement of the Arthur Andersen award; and (v) Blue Tee's counterclaims should be denied in their entirety.

Blue Tee moved to set aside the AAA award. In December 1992, the district court issued *Blue Tee Corp. v. Koehring Corp.* (*Blue Tee III* ), 808 F.Supp. 343 (S.D.N.Y. 1992), in which it confirmed the award of the AAA panel. This appeal followed.

### Discussion

On appeal, Blue Tee offers a number of reasons why we should reverse the district court. Before discussing them, we note that § 10(d) of the Act (currently 9 U.S.C. § 10(a)(4)), the statutory basis for Blue Tee's attack upon the AAA award, is to be accorded the "narrowest of readings." *Andros Campania Maritima, S.A. v. Marc Rich & Co. A.G.*, 579 F.2d 691, 703 (2d Cir.1978). Moreover, we agree with the district court that Blue Tee "bears the burden of proof that the AAA arbitrators exceeded their authority." 808 F.Supp. at 346. We believe that this burden is particularly difficult here in the face of Judge Sweet's three careful opinions and the significance of Blue Tee's actions and representations, with which he was obviously familiar.

Blue Tee's strongest argument to us is that, in contrast to the usual arbitration litigation, the contract here had two arbitration clauses, that the narrower one (Section 3.3) should govern on those issues that fall within its ambit, and that under Section 3.3, only Arthur Andersen could decide the effect that the last-minute amendment had on price. This was the basis for Blue Tee's request, in its petition to the district court to vacate the AAA award, that the proceeding be remanded to the AAA arbitrators with a direction that they issue an opinion "resolving the contract interpretation issues" while refraining from making any monetary award, and that the dispute thereafter be resubmitted to Arthur Andersen for still another arbitration proceeding in which Arthur Andersen would presumably decide what the AAA opinion meant in monetary terms.

We have a number of problems with Blue Tee's position. While it is perhaps true that ordinarily a specific arbitration clause might trump a general one, the situation at the time Judge Sweet confirmed the AAA award in *Blue Tee III* was far from ordinary. First, Blue Tee had apparently conceded in one of the earlier proceedings before him that the issues concerning the asserted last-minute amendment were arbitrable before the AAA. Whether that concession also included the AAA panel's right to quantify an award based upon its decision as to the amendment of the Agreement is disputed. Judge Sweet apparently thought it did, and all the prior court proceedings had been before him. Moreover, Blue Tee knew from AMCA's demand for the AAA arbitration that AMCA was seeking specific monetary damages based upon its claim that the last-minute amendment controlled the price for the inventory. Despite this knowledge, Blue Tee points to no evidence—with one exception—that it sought to limit the authority of the AAA panel to issue a damage award. That exception is Blue Tee's post-hearing written summation to the AAA panel, by which time it may very well have been clear, as AMCA asserts, which way the wind was blowing.

In addition, when Judge Sweet decided *Blue Tee III* in December 1992, it had been almost three years since the Arthur Andersen arbitration panel had issued its award, later confirmed in *Blue Tee I* and pursuant to which AMCA had paid back to Blue Tee over $1 million. A remand back to Arthur Andersen in such circumstances would have been not only awkward and time-consuming but also contrary to the policies behind the doctrine of *functus officio,* see, e.g., *Trade & Transport, Inc. v. Natural Petroleum Charterers, Inc.,* 931 F.2d 191, 193 (2d Cir.1991), the very policies relied upon by Blue Tee when AMCA asked Arthur Andersen to quantify the effects of AMCA's position on the assumption that the Agreement had been amended.

■ Moreover, a remand now to Arthur Andersen would seem a particularly unappealing course since the AAA panel had clearly been properly invested with the basic underlying dispute by Judge Sweet's decision in *Blue Tee II.* Certainly, nothing in the language of Section 12.15 itself suggests that once the AAA arbitrators have decided an issue within their competence, they are barred from quantifying the effect of their rulings. The broad language of Section 12.15 empowers the AAA arbitrators to render a final and binding award enforceable in a court of competent jurisdiction. When the dispute proceeded to arbitration before the AAA, the AAA panel was fully empowered to interpret the Agreement and the rights and obligations of the parties and to fashion appropriate relief. See *Synergy Gas Co. v. Sasso,* 853 F.2d 59, 64 (2d Cir.), *cert. denied,* 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988). Blue Tee's basic position is simply that, while the AAA panel had authority to decide whether there was a last-minute amendment of the Agreement, it did not have the authority to quantify the effects of that decision. On this record Judge Sweet was not persuaded, and neither are we.

In support of its argument that whenever a contract contains both a narrow arbitration clause and a broad arbitration clause, the narrow clause always governs, Blue Tee cites a number of decisions. However, the cases upon which it principally relies all involve arbitrators who, acting under a general arbitration clause, attempted to bypass a narrow arbitration clause. For example, in *Ameri-*

can Silk Mills Corp. v. Meinhard–Commercial Corp., 35 A.D.2d 197, 315 N.Y.S.2d 144 (1st Dep't 1970), the seller attempted to bypass completely a contractual provision that required disagreements over the value of inventory to be referred to a national accounting firm in the first instance. As Judge Sweet pointed out, in American Silk, the New York court simply ruled that "since no reference at all had yet been made to an accounting firm, the seller's attempt to initiate a general arbitration was premature." 808 F.Supp. at 346.

In contrast to American Silk, AMCA never attempted to bypass the narrow arbitration clause. AMCA not only submitted its dispute to Arthur Andersen, but also tried to persuade Arthur Andersen that it should not disclaim authority to resolve the dispute over the asserted last-minute amendment of the Agreement. And even then, as already noted, AMCA unsuccessfully tried to persuade Arthur Andersen to quantify the effects of AMCA's construction of the Agreement. It was only after Arthur Andersen, following Blue Tee's urging, ruled that it had no authority to decide the effect of the last-minute amendment that AMCA invoked the broad arbitration provision. Thus, as Judge Sweet noted, "the AAA arbitration was in no sense premature," and American Silk was inapplicable. Id. at 347.

Blue Tee's reliance on Dimson v. Elghanayan, 19 N.Y.2d 316, 280 N.Y.S.2d 97, 227 N.E.2d 10 (1967), is similarly misplaced. There, an appraiser had already made a specific valuation under a narrow arbitration clause. The disappointed party then sought to overrule the appraiser's valuation by resort to a general arbitration clause. Dimson has no application here because AMCA has not challenged Arthur Andersen's valuations. Indeed, Arthur Andersen never made any valuations pursuant to the method apparently agreed to by the parties at the last minute. The Arthur Andersen arbitration thus left the valuation issue unresolved. AMCA was not required to forego an opportunity to arbitrate the unresolved issues.

Blue Tee also relies on Proodos Marine Carriers Co. v. Overseas Shipping & Logistic Co., 578 F.Supp. 207 (S.D.N.Y.1984). In Proodos, the court first took note of the general rule that "once an arbitration panel decides the submitted issues, it becomes functus officio and lacks any further power to act," 578 F.Supp. at 211, and then found an exception in situations where a broad arbitration provision is contained in an ongoing long-term contract. Blue Tee's reliance on Proodos is misplaced for several reasons. First, Arthur Andersen was empowered only by the narrowly limited arbitration provision of Section 3.3, in contrast to the broad clause in Proodos which empowered the panel to resolve "any dispute" between the parties. Id. at 208. Second, the dispute between AMCA and Blue Tee did not arise in the context of a long-term contract or ongoing relationship.

Blue Tee also argues that the court's error in Blue Tee III is shown by hypothesizing what would have happened if AMCA had gone to the AAA first rather than to Arthur Andersen. But AMCA did not go to the AAA first. It went to Arthur Andersen and, after the award there, tried to persuade Arthur Andersen to make the sort of quantification that Blue Tee now says only Arthur Andersen can make, but then opposed. The situation now is changed sufficiently so that we cannot say that Judge Sweet erred when he declined to order still another arbitration.

■ In sum, Judge Sweet decided that the AAA panel could justifiably regard the process of deciding whether the Agreement had been amended, how it had been amended and how the amendment affected the final price as a single process for reaching a final award. Though Judge Sweet appears to have thought that the scope of the AAA panel's arbitration was a matter for that panel to decide, we believe that under New York law, which the parties made applicable, see Barbier v. Shearson Lehman Hutton, Inc., 948 F.2d 117, 121–22 (2d Cir.1991), it was an issue for court determination. See Dimson, 19 N.Y.2d at 324–25, 280 N.Y.S.2d 97, 227 N.E.2d 10; American Silk, 315 N.Y.S.2d at 146–47. Under the circumstances of this case, we believe it was appropriate to permit the AAA panel to resolve the quantification issue.

We have considered all of Blue Tee's arguments and they are without merit.[2] Accordingly, the judgment of the district court is affirmed.

---

**2.** This includes its argument that the September 21, 1992 affidavit of Robert B. Cordle is not properly part of the record on appeal.