### GREASON *v.* KETELTAS.

A trustee holding a legal fee, determinable when the purposes of the trust shall cease, has power at law to lease for a term which may extend beyond the period of his trust estate, subject to the jurisdiction of a court of Equity to annul the lease if unreasonable or improvident.

A trust created by Will to receive the rents and profits of unoccupied and unimproved real estate liable to large taxes and assessments, for the lives of the testator's children, and out of the same to uphold, support, amend, repair, &c., and pay all charges on the land, *held* to authorize a lease for twenty-one years with a covenant to renew or to pay for buildings to be erected by the lessee.

Such a covenant is binding upon the trustee personally; and one who succeeds to the trust, and has the control of the estate, is liable upon such a covenant in a lease made by his predecessor in the trust.

An action was brought for the specific performance of such a covenant, or for damages. The complaint made a case for damages, but none for specific performance. The trial was commenced before a judge, without jury, no objection being made. *Held*, a waiver of the right to trial by jury, and a judgment for damages sustained.

APPEAL from the Supreme Court. The prayer of the complaint was that the defendants be decreed specifically to

perform the covenants in a certain lease of land in the city of New-York, for a renewal thereof, or for paying the value of the buildings thereon, in case of a failure to renew. As an alternative it prayed judgment for the value of the buildings and of a renewal of the lease, to be appraised under the direction of the court, and for the rents and profits of the land since the expiration of the original lease.

Upon the trial, before Mr. Justice ROOSEVELT, at special term, and without a jury, it appeared that John Gardner deceased, by his will, dated July 2, 1817, devised his real estate to James Gardner and two others, their heirs and assigns, and the survivors, &c., of them, and the heirs, &c., of the survivor, in trust, during the lives of the testator's son John and his two daughters, "in the first place, out of the rents, issues and profits thereof to uphold, support, amend and repair all and singular my real estate with all needful and necessary amendments, repairs and alterations, and pay, satisfy and discharge all costs, expenses, charges and other impositions, taxes and assessments." The trustees were next to pay to the son and daughters of the testator, during their natural lives, in certain proportions, the residue of the rents and profits of all his real and personal estate; and a further trust was, if the son John should die, leaving issue, to pay to such issue the proportion to which John had been entitled, and if he died without issue, to distribute the proportion equally between the two daughters, during their lives, and in case of their or either of their deaths, without issue, between the survivor or survivors and her or their lawful issue. The testator also appointed the trustees his executors. At the time of the testator's death, and up to the time of the lease in 1825, nearly all his estate consisted of about one hundred vacant and unimproved lots in a part of the city of New-York which was little inhabited, and in which large expenses were being incurred and impending for flagging and paving streets, and other municipal improvements. The judge found, as matters of fact, that in 1825 the lot mentioned in

Greason *v.* Keteltas.

the pleadings was worth about $1,000, and that a lease at five per cent upon that valuation, for the time and upon the conditions mentioned in the lease in this case, would be a reasonable and proper lease, and in accordance with the usual and ordinary terms of leasing property of that description, and that it was prudent and proper to give the lease, great exertions having been made by the testator in his lifetime, and required after his death, to lease the property with a view to the payment of taxes and assessments.

On the 19th March, 1825, the trustees leased to one John Greason, to whose rights the plaintiff in this action succeeded, a lot for the term of twenty-one years, from the first day of May then next, at the yearly rent of fifty dollars, the lessee covenanting to pay all taxes and assessments, ordinary or extraordinary. The lessee also covenanted to erect upon the lot, within one year, a good and substantial house, of specified dimensions. It was mutually covenanted that, at the expiration of the term, the value of the building so to be erected should be ascertained by two sworn appraisers, one to be chosen by each of the parties, or, in case of their disagreement, by a sworn umpire, to be chosen by the appraisers; and that if, upon service on them of such appraisement in writing, the lessors, their representatives, &c., should not, within thirty days, pay the amount of the valuation to the lessee, his representatives or assigns, then the lease should be renewed for the further term of twenty-one years, upon such rent as should be agreed upon by the parties, or determined by appraisers and an umpire, to be chosen as aforesaid.

The lessee entered and erected a house, in compliance with his covenant. On the 23d April, 1846, the plaintiff nominated an appraiser to value the building, and gave notice thereof to the defendant, Keteltas, who had succeeded to the original trustees by appointment of the late Court of Chancery and by survivorship, calling on him to nominate another appraiser. Keteltas refused to take any

step towards an appraisal, and received the rents of the premises after May 1, 1846, having recovered in an action of ejectment against the tenants of the plaintiff.

In 1839, the defendant, Keteltas, and his then co-trustee, procured the passage of an act, by the legislature, authorizing them to make leases for the term of twenty-one years, containing covenants to pay for improvements to be made on the demised premises by the tenants, "and to comply with all covenants so to be made as aforesaid, or which are contained in leases heretofore made by the trustees, under the will of John Gardner, deceased." (*Laws of* 1839, *ch.* 345.)

The surviving children of James Gardner, who were married women, and had children living, were, with their husbands, parties defendant in this action.

The judge found that the building erected under the lease in question was worth $1,200, and ordered judgment for the plaintiff for that sum, with interest from May 1, 1846. The defendants excepted. They had excepted to the refusal of the judge, at the commencement of the trial, to dismiss the complaint, for reasons which are discussed in the following opinion. The judgment was affirmed at general term in the first district, and the defendants appealed to this court.

*George Wood,* for the appellant.

*Nicholas Hill,* for the respondent.

SELDEN, J. The trustees under the will of John Gardner took an estate in fee; and although that estate was not absolute, but determinable upon the death of the three children of the testator, the whole legal title was, nevertheless, during the continuance of the estate, vested in the trustees. By virtue of this title, the trustees had authority to grant leases for such length of time, and upon such terms, as they might think proper, and at law all such leases would be valid.

But although good at law, whatever may be their terms, they are, nevertheless, subject to the supervisory jurisdiction exercised by courts of equity over every species of trust. As, however, the will in this case contained no limitation, either express or implied, upon the powers which the trustees possessed as incident to their legal estate, the only ground upon which a court of equity can interfere with leases executed by them is, that such leases are to be regarded, in view of the duration of the trust estate, and the object of the trust, as an abuse, or grossly improvident exercise by the trustees of the powers with which they are clothed. In all such cases, if the trustees act honestly, and with a reasonable degree of prudence and foresight, their acts are to be upheld.

Under the proof adduced in this case, there would seem to be very little ground for imputing to the trustees any want of good faith, or even of the most scrupulous care and caution, in the execution of their trust. Taking into consideration the situation of the property covered by the lease in question, and also the condition of the trust fund, the conduct of the trustees in the premises would seem to have been reasonable and proper, and in accordance with the principles adopted by judicious individuals in the management of their own estates similarly situated. The objections taken to the validity of the lease, therefore, cannot be sustained, either upon the ground of a want of power, or of an abuse or improper exercise of such power on the part of the trustees.

But it does not necessarily follow that the judgment can be sustained. There are some difficulties growing out of the nature of the action, and the manner in which it was tried. The original object of the suit, as disclosed by the prayer of the complaint, was to enforce a specific performance of the covenants entered into by the trustees; and had the covenant for a renewal or extension of the lease been made to depend upon a failure or refusal on the part of the

trustees to choose an appraiser, there would, perhaps, have been no difficulty in sustaining the action in that aspect, as a judgment or decree, that unless the defendants should voluntarily select an appraiser they should renew the lease, would have been unobjectionable. As, however, the covenant to renew is dependent entirely on the failure to pay, and there could be no such failure until the value was ascertained, the only decree for a specific performance, which the court could make, would be one compelling the defendants to choose an appraiser.

It is well settled that courts of equity will never entertain a suit to compel parties specifically to perform an agreement to submit to arbitration. (*Gourlay* v. *Duke of Somerset,* 19 *Ves.,* 431; *Agar* v. *Macklew,* 2 *Sim. & Stuart,* 418.) To do so, would bring such courts in conflict with that policy of the common law which permits parties in all cases to revoke a submission to arbitration already made. This policy is founded in the obvious importance of securing fairness and impartiality in every judicial tribunal. Arbitrators being selected, not by law, but by the parties themselves, there is danger of some secret interest, prejudice or bias in favor of the party making the selection; and hence the opposite party is allowed, to the latest moment, to make inquiries on the subject. So scrupulously is this right of revocation guarded, that it is not lost, although the submission has been actually made a rule of court. (*Mitchell* v. *Harris,* 2 *Ves.,* 129, *notes* 3, 4, *Sumn. ed.*) But an additional reason for the refusal of courts of equity to entertain jurisdiction in such cases is, that it is against their policy to make decrees which they cannot enforce. If the arbitrator be named in the decree, this would violate the policy of the law as to the right of revocation; and if not named, the decree could readily be evaded by choosing an arbitrator who would refuse to act.

In view of these principles it is clear that the plaintiff cannot maintain this as an action for a specific performance;

Greason *v.* Keteltas.

and there is, so far as I can see, no other ground of equity jurisdiction to which it can be referred. If the leases were valid, the only remedy of the plaintiff is by an action at law, to recover damages for a breach of the covenants which they contain; and as the complaint sets out the covenants at length; the substitution of the defendant, Keteltas, together with Thomas and McCarthy, as trustees; the death of McCarthy, and the absolute refusal of Keteltas to select an arbitrator, it contains all the facts essential to an action upon the covenant, if such an action can be maintained.

Although parties who act in respect to the property in their hands in the capacity of trustees only are not ordinarily under any obligation, in executing the duties of their trust, to enter into any personal covenants in relation to the trust property, yet, when they voluntarily do so, they are not only themselves bound to perform such covenants, but those who succeed to their rights as trustees are also bound, so long as they retain the control of the property to which they relate. (*Simons* v. *Bolland,* 3 *Mer.,* 547; *Attorney-General* v. *Morgan,* 2 *Russ.,* 306; *Wedgwood* v. *Adams,* 6 *Beav.,* 600.) The successors are chargeable, in such cases, as assignees of the property, by virtue of their pernancy of the profits. Executors are chargeable personally upon the same ground. (*Helier* v. *Casebert,* 1 *Lev.,* 127; *Sackvill* v. *Evans, Freem.,* 171.) If the assignees would avoid this responsibility they must divest themselves of the trust estate.

By the lease in question, the parties "mutually covenanted" that, at the expiration of the term, the value of the buildings should be ascertained by two sworn appraisers, one of whom should be chosen "by each of the said parties." There is no doubt that this was a personal covenant, and binding as such upon the trustees; and as the defendant, Keteltas, has succeeded by substitution and survivorship to all the rights of the original trustees, this covenant, which attaches itself to the estate, is obligatory upon him so long as he retains the title to the premises.

SMITH. — VOL. III.    63

This leads, of course, to the conclusion that the action is strictly an action at law; that it should have been brought against Keteltas alone, and have been tried by a jury and not by the court. The only serious questions in the case, therefore, are, whether the error in respect to the mode of trial, or in respect to the form of the judgment, as being against all the defendants instead of against Keteltas alone, are sufficient to reverse the judgment. Had these objections been taken at the proper time and in the proper form, they would, no doubt, have been fatal to the recovery; the first as to all the defendants, and the last as to all except the defendant, Keteltas. But the objection in respect to parties was not made at all; and that in respect to the mode of trial, only as a part of the motion to dismiss the complaint.

The right to a trial by jury in a proper case is absolute, and any decision of the court, overruling or denying such right, would be plainly erroneous. But it is a right which can be wavied; and if a party who is entitled to it enters voluntarily upon a trial by the court, without objection, he would ordinarily, no doubt, be understood as consenting to that form of trial. In this case the defendants not only remained silent on the subject of a trial by jury until after the judge had entered upon the trial, but the objection, when stated, was insisted upon only as one of the reasons for dismissing the complaint. In this aspect it was, of course, overruled. It could afford no ground for dismissing the complaint. If the defendants intended to insist that the cause, if tried at all, should be tried by a jury, they would have raised the question before entering upon the trial, or at least would have persisted in the objection after the motion to dismiss the complaint was denied. Upon the whole, I think there is no error of which the defendants can avail themselves upon this appeal.

The judgment should be affirmed, with costs.

Greason *v.* Keteltas.

PRATT, J. It is not necessary, to a correct determination of this case, to define with precision the nature and quantity of the interest which the trustees took under the will. Assuming it to be a contingent determinable estate, to be determined upon the death of one or all of the children, as claimed by the counsel for the defendants, it by no means follows that the lease and the covenants contained in it were not valid and binding upon the trustees. They were vested with the legal estate at least during the lives of the children of the testator. This was a greater interest than any estate for years, however long. At law, therefore, the leases being justified by the quantity of the estate in the lessors, they cannot be impeached. Nevertheless, they are subject to the control of a court of equity. But in exercising this control the court is not restricted to any arbitrary rules, but will merely take care that what the trustees do in regard to the estate shall be reasonable. (1 *Platt on Leases,* 345.) In ascertaining what is reasonable, a reference to the circumstances of each case is indispensable. The nature of the property and the custom of the country must also be taken into consideration. (*Hill on Trustees,* 428.)

In this case the testator must have contemplated, and the probabilities were, that the property would remain under the control of the trustees for a long time. A considerable portion of the property which passed to them by the will consisted of vacant lots in the city of New-York. The trustees had no power to sell, but were required, "out of the rents, issues and profits thereof, to uphold, support, amend and repair all and singular his real estate with all needful, necessary amendments and repairs and alterations, and pay, satisfy and discharge all costs, expenses and charges, and other impositions, taxes and assessments," &c., and the residue was to be paid over to his children in certain prescribed proportions. These vacant lots could only be made productive by leasing them. It was the only possible method by

which any rents, issues and profits could be realized from this portion of the estate. But they could not be rented to remain vacant lots. In that condition they would be of no use to a tenant, and no one would hire them. It was therefore necessary, in order to put them in a condition that they might be leased and rents received from them, that they should be improved, and the necessary buildings put upon them. The trustees, could we find no express powers conferred upon them in the terms "needful amendments and alterations," contained in the will, would be vested by implication with the power not only to lease the premises, but to make them capable of being leased by placing upon them such reasonable improvements as were necessary for that purpose.

"Trustees who are invested with the general powers of management, will be justified in laying out money in the repairs and improvements of the property, such as draining, *building farm houses,* &c., manuring, and other similar works." (*Hill on Trustees,* 429, 571; *Bowers* v. *Earl of Strathmere,* 8 *Lond. Jur.,* 92.) And if they would be justified in laying out money directly for that purpose, they of course would have the power to make an arrangement with the tenant by which buildings put up by him should be paid for at the end of the term.

In this case, I think the terms of the will indicate plainly that it was the design of the testator to confer the power to improve the real estate. All needful amendments, repairs and alterations, are terms, when applied to real estate, and especially vacant city lots, which would embrace improvements in the form of necessary buildings to make the lots tenantable. The expenses incurred in making these amendments and improvements were to be met and paid with the rents, issues and profits of the real estate. But as no rents could be obtained until it was leased, and as it could not be leased until it was improved, or unless some provision was made for its improvement, the only method which

Greason *v.* Keteltas.

the trustees had for improving the lots and making them productive was, by granting just such leases, with just stipulations for improvements, as were made in this case. Their acts, therefore, it seems to me, in any view we may take of them, were justifiable. They were justified by the provisions and directions of the will; they were justified by the implied powers which attend the general power of management; they were justified by the general usage and custom of owners of real estate similarly situated. Indeed, it seems to me, if the trustees had allowed the property for forty years, the time which has now elapsed since the death of the testator, to have remained vacant and unproductive, subject annually to the enormous taxes and assessments to which property in New-York is subject, they might well have been chargeable with gross neglect of the duties which they had assumed in accepting the trust. They would have been more culpable than the unprofitable servant, who hid the talent intrusted to him in a napkin, for in that case no expense would be incurred in its preservation.

It is said that the stipulation to renew the lease was not valid. I think it is of no importance whether it be or not. The stipulation to renew was in the alternative, at the option of the lessors. The fact that one part of the alternative was not binding upon the trustees, would constitute no good reason why they should be relieved from performing that which is valid and binding.

Upon the whole, I am satisfied that the judgment of the court below was right, and should be affirmed.

JOHNSON, Ch. J., did not sit in the case; all the other judges concurring,

Judgment affirmed.