**CENDANT CORPORATION,**
Petitioner,

v.

**Walter A. FORBES, Respondent.**

**No. 99 CIV. 4869(JSR).**

United States District Court,
S.D. New York.

Oct. 8, 1999.

Robert B. Fiske, Jr., Harry A. Chernoff, Marianne Fogarty, Davis, Pork & Wardwell, New York City for petitioner.

George A. Borden, Brendan V. Sullivan, Jr., John J. Buckley, Jr., Emmett T. Flood, David Aufhauser, Williams & Connoly, Washington DC, Robert Schrager, Bondy & Schzoss, New York City, for respondent.

*OPINION AND ORDER*

RAKOFF, District Judge.

This Opinion And Order confirms the Court's bench ruling of September 13, 1999, which denied respondent's motion seeking to dismiss or stay this action pending arbitration.

The pertinent allegations, essentially undisputed, are as follows. On July 28, 1998, the Board of Directors of petitioner Cendant Corporation held a special meeting in New York to consider terminating the employment of respondent Walter A. Forbes, who had served as Chairman of the Board since the corporation's inception but was now involved in inquiries concerning certain alleged accounting irregularities. While an agreement had already been drafted terminating Mr. Forbes "without cause" (the "Termination Agreement"), concern was expressed during the Board

meeting as to whether Forbes had previously received reimbursement for expenses above and beyond the "reasonable travel, entertainment, business and other expenses" for which he was entitled to reimbursement under the terms of his employment contract with Cendant. Verified Petition, Ex. D, Restated Employment Agreement ("Employment Agreement"), Section V.

In order to resolve this issue and obtain the Board's approval of the Termination Agreement, Forbes signed and delivered to the Board a letter (the "Audit Letter"), drafted by his own counsel, that stated: "I will remit to the Company any overcharge the Audit Committee [of the Board of Directors] determines exists with respect to my expense items as discussed at the Special Board Meeting on July 28, 1998." Verified Petition Ex. A., Letter of Walter Forbes dated July 28, 1998 ("Audit Letter"). Contemporaneously, the parties executed the Termination Agreement, pursuant to which Forbes received $35 million in cash, as well as options to purchase 1,266,-500 shares of Cendant common stock at $17.00 per share. *See* Verified Petition Ex. B, Termination Agreement, Section 1(b).

Thereafter, the Audit Committee, with input from Forbes and his counsel, conducted an investigation into Forbes' expenses and determined that an overcharge of $2,145,446 had occurred. By letter dated March 19, 1999, Cendant demanded that Forbes remit this amount. Forbes refused and, on April 16, 1999, initiated an arbitration seeking, *inter alia,* a declaration that he was not required to make the payment demanded by Cendant. In initiating the arbitration, Forbes purported to act pursuant to the arbitration provision of the Employment Agreement, which states in pertinent part:

> Any controversy, dispute or claim arising out of or relating to this Agreement or the breach hereof which cannot be settled by mutual agreement ... shall be finally settled by binding arbitration

in accordance with the Federal Arbitration Act ....

Employment Agreement Section XIX.

On June 7, 1999, Cendant filed its answer in arbitration, asserting, *inter alia,* that Forbes had waived arbitration by executing the Audit Letter. Simultaneously, Cendant filed a petition in New York State Supreme Court, seeking to confirm the Audit Committee's determination pursuant to Section 7601 of New York's Civil Practice Law and Rules ("Section 7601"), which empowers courts to confirm, modify or vacate valuations or appraisals by which parties have contractually agreed to abide. *See* N.Y. CPLR § 7601; *see also Penn Central Corp. v. Consolidated Rail Corp.,* 56 N.Y.2d 120, 128–30, 451 N.Y.S.2d 62, 436 N.E.2d 512 (1982); *Questrom v. Federated Dept. Stores, Inc.,* 41 F.Supp.2d 294, 307 (S.D.N.Y.1999).

On July 7, 1999, Forbes timely removed Cendant's petition to this Court on grounds of diversity of citizenship. Thereafter, Forbes filed the instant motion to stay or dismiss the action pending arbitration, arguing, *inter alia,* that under the arbitration provision of the Employment Agreement the parties had agreed to arbitrate the instant dispute or at least to arbitrate whether the dispute was eligible for arbitration. On September 13, 1999, following oral argument, the Court denied the motion from the bench. This Opinion And Order confirms that ruling and briefly elaborates the reasons therefor.

■ *First,* as to the threshold question of who should decide whether the instant controversy is arbitrable, the answer is the Court. While the parties' intent ultimately controls, it is settled law that unless there is "clear and unmistakable" evidence that the parties intended otherwise, the question of whether a particular dispute is arbitrable is one that must be judicially resolved. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *accord Paine-*

*Webber, Inc. v. Bybyk,* 81 F.3d 1193, 1198–99 (2d Cir.1996).

■ Here, Forbes concedes that the parties did not enter into an express agreement to arbitrate arbitrability but argues that they nonetheless manifested an intention to arbitrate arbitrability by agreeing to arbitrate "[a]ny controversy, dispute, or claim arising out of" the Employment Agreement. *See* Employment Agreement, Section XIX, *supra.* This argument, however, overlooks the qualifying language limiting the scope of the foregoing to any controversy, claim or dispute "which cannot be settled by mutual agreement." *Id.* The contract gives no indication—let alone a "clear and unmistakable" one—that the parties intended for the arbitrator to determine the arbitrability of whether or not a particular controversy falls within or outside this carve-out, or whether, for that matter, it arises under a separate agreement. Yet these are the immediate issues here, and are therefore for the Court to decide. *Cf. Rochdale Village, Inc. v. Public Service Emp. Union,* 605 F.2d 1290, 1295 (2d Cir.1979) (where arbitration provision was limited to disputes arising under a particular agreement, the issue of whether a dispute was arbitrable or whether the arbitration clause was terminated by a collateral agreement was for the court); *Prudential Lines v. Exxon Corp.,* 704 F.2d 59, 64 & n. 5 (2d Cir.1983) (same).

■ *Second,* the controversy here is not subject to mandatory arbitration under the Employment Agreement for two independently sufficient reasons. To begin with, it does not arise under the Employment Agreement. Rather, it arises under the Audit Letter. That letter is an independently-negotiated, separately-executed contract that nowhere refers to the Employment Agreement and that deals with a subject not directly covered by the Employment Agreement: the remittance of improperly reimbursed expenses. Consequently, it is not subject to the arbitration clause of the Employment Agreement.

It is true that the Audit Letter may be viewed as in some sense collateral to the Employment Agreement or, more immediately, the Termination Agreement. But "[i]f a dispute arises under a collateral agreement, arbitration of that dispute cannot be compelled merely based upon the existence of an arbitration clause in the main agreement." *Prudential,* 704 F.2d at 63.[1]

Independently, moreover, even if the arbitration provision in the Employment Agreement had some application to this controversy, the result would be the same. The provision, as noted, requires arbitration of only those disputes "which cannot be settled by mutual agreement," Employment Agreement Section XIX. Here, it is plain from the face of the Audit Letter that the parties' dispute relating to overcharged expenses was settled by mutual agreement when Forbes agreed to abide by the determinations of the Audit Committee instead of proceeding to arbitration.

Indeed, to require Cendant to arbitrate in the face of the Audit Letter would run contrary to the letter's obvious purpose, which was to submit the question of improperly reimbursed expenses to a group of appraisers—the Audit Committee—in lieu of arbitration. When parties enter into an agreement to submit an otherwise arbitrable question to an appraiser, it is logical to conclude that, by entering into the appraisal agreement, they intend to

---

1. The fact that the Audit Letter is an independent contract, rather than a modification of the Employment Agreement, defeats Forbes' argument that the substantive law of Connecticut should apply to the instant controversy pursuant to the choice of law clause contained in the Employment Agreement. Rather, the instant dispute is governed by the law of New York. Nonetheless, the Court has independently considered whether the Court's decision on this motion would be any different if it applied the law of Connecticut or the law of Delaware (the two jurisdictions other than New York whose laws might arguably apply) and concludes that the result would be identical.

remove the question from the range of arbitrable matters and to be bound by the appraiser's findings. *See Dimson v. El-ghanayan,* 19 N.Y.2d 316, 324–25, 280 N.Y.S.2d 97, 227 N.E.2d 10 (1967). Here, no other interpretation of the Audit Letter is plausible. To contend, as Forbes does, that he retained the right to arbitrate despite his unequivocal promise (in plain and simple language drafted by his own counsel) that he *"will* remit to the Company any overcharge *the Audit Committee determines* exists with respect to my expense items" (emphasis supplied) is to argue that "will" really means "might," that "Audit Committee" really means "arbitrator," that Forbes retained every material right he had before he entered into the Audit Letter, and that the Audit Letter is essentially meaningless. The force of reason would be weak indeed if it succumbed to such sophistry.

*Third,* Forbes' fall-back argument—that Cendant's petition must be dismissed because the remedies provided by New York's CPLR Section 7601 are unavailable in federal court—is more colorable but ultimately unpersuasive.

Forbes premises his argument on the twin contentions that federal courts may provide only such equitable relief as was historically available in courts of equity and that appraisal agreements were historically unenforceable in those courts. Consequently, he argues, since the Audit Letter is in essence an appraisal agreement, the Court lacks the power to enforce it through the equitable remedies contained in Section 7601 and this action must be dismissed, leaving Cendant to seek relief, if at all, in an action at law for breach of contract.

■ Upon scrutiny, however, Forbes' syllogism breaks down, because each of its premises is overstated in critical respects. Most importantly, Forbes is unable to adduce any convincing authority to support a claim that an appraiser's award, *once*

*made,* was historically unenforceable in equity. At most, the cases cited by Forbes show only that traditional courts of equity would not specifically enforce *executory* arbitration or appraisal agreements, *see, e.g., In re Fletcher,* 237 N.Y. 440, 448–49, 143 N.E. 248 (1924) (reversing order appointing appraiser on the ground that it was unauthorized under the New York Arbitration Law and suggesting in dictum that specific performance of an executory appraisal agreement would not be granted); *Greason v. Keteltas,* 17 N.Y. 491, 1858 WL 9045, *3 (1858) (noting that a court of equity may not specifically enforce an executory agreement to arbitrate).

In traditional courts of equity, however, no such bar applied once an agreement was no longer executory. Rather, if a dispute had already been decided by a third party, any award made by that party was "held obligatory ... and courts of law as well as of equity [would] enforce it." *Tobey v. County of Bristol et. al.,* 23 F.Cas. 1313, 1321 (C.C.D.Mass.1845) (No. 14,065); *accord Red Cross Line v. Atlantic Fruit,* 264 U.S. 109, 121, 44 S.Ct. 274, 68 L.Ed. 582 (1924) (noting that while the breach of an executory agreement to arbitrate will only support an action for damages, if an arbitration agreement has been "executed—that is, if an award has been made—effect will be given to the award in any appropriate proceeding at law or in equity.").

Accordingly, in the instant case, where the contracted-for appraisal has already been completed by the Audit Committee and Cendant seeks only to enforce the appraisers' award—not to compel a future appraisal—there is no historical barrier to providing equitable relief.

■ While this is dispositive, the Court also concludes that Forbes' other premise—that federal courts may provide only such equitable relief as was historically available in courts of equity [2]—is inapplica-

2. Although this limitation is sometimes loose-

ly referred to as a limitation on the equitable

ble to a diversity case, like this one, grounded upon a state statute providing a specific equitable remedy.

It is true that the issue appears unresolved in the Supreme Court. Thus, only last term, the Court, in *Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999), declined to reach the issue. Specifically, even though that case was a diversity action, the Court chose not to consider whether the availability of equitable relief should be "determined by state law," *Grupo Mexicano,* 119 S.Ct. at 1968 n. 3 (1999), because the issue had neither been "raised nor considered below." *Id.* Instead, the Court decided the case under Fed R. Civ. P. 65 and federal equity principles without considering the impact of state law, *see id.,* and reaffirmed the history-based limitation on federal equitable remedies in this context only.

In arguing, nonetheless, that the history-based equity limitation should also apply to diversity cases, Forbes invokes the doctrine of "equitable remedial rights," which provides, among other things, that the range of equitable remedies available in federal court can neither be enlarged nor restricted by state law. *See generally* 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4513.[3] However, while this argument might have had considerable force in the early part of this century,

the vitality of the "archaic and byzantine" doctrine of equitable remedial rights has since been called into question, most particularly by the Supreme Court's decision in *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, Wright et. al., *supra,* § 4513 at 425, 434–51.[4]

The *Erie* doctrine and its underlying mandate that a federal court sitting in diversity reach substantially the same result as the corresponding state court would be difficult to reconcile with any continuing rule that requires the federal court to withhold statutory remedies available in the state court. While there might be some limited settings in which the doctrine of equitable remedial rights might still apply, *see, e.g., Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 105–06, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) (noting in dictum that restrictions on federal equitable relief apply in a diversity case notwithstanding state law),[5] where the two doctrines are as a practical matter irreconcilable, the rule of *Erie* must prevail, for it is of constitutional stature, *see Erie,* 304 U.S. at 78–80, 58 S.Ct. 817, while the doctrine of equitable remedial rights is at most a creature of statute.

Such a conflict would exist in a diversity case where the historically "novel" equitable remedy called for by the state statute was part of the state law that the federal

"jurisdiction" of the federal courts, it is not, in fact, jurisdictional in nature: it does not deprive the Court of authority to hear a case, but merely restricts the remedies a court may grant. *See Atlas Life Ins. Co. v. W I Southern, Inc.,* 306 U.S. 563, 568, 59 S.Ct. 657, 83 L.Ed. 987 (1939); *Massachusetts State Grange v. Benton,* 272 U.S. 525, 528, 47 S.Ct. 189, 71 L.Ed. 387 (1926).

3. The doctrine derives from the Judiciary Act of 1789 and the Process Act of 1792 and it is essentially an interpretation of the equitable powers conferred on the Courts by those statutes. *See Robinson v. Campbell,* 16 U.S. 212, 221–223, 3 Wheat. 212, 4 L.Ed. 372 (1818); *see also* Wright et. al., *supra,* § 4513 at 426.

4. The adoption of the Federal Rules of Civil Procedure in 1938, and the attendant merger of law and equity in the federal courts, also served to undermine the doctrine. *See* Wright et. al., *Federal Practice and Procedure* § 4513 at 433–34 ("Since the equitable-remedial-rights doctrine had arisen primarily in cases dealing with the appropriate classification of actions as between law and equity, the merger of law and equity effected by the promulgation of the Federal Rules removed the historical basis of the doctrine.")

5. This dictum has been repeatedly criticized by commentators as inconsistent with the decision's holding and with the policies of *Erie.* *See* Wright et. al., *supra,* § 4513 at 437–39 & n. 48.

court would be required to apply under *Erie.* Whether such application is required would involve, in turn, asking the familiar *Erie* questions: whether the remedy is "bound up" with the rights and obligations of the parties, *Byrd v. Blue Ridge Rural Elec. Cooperative, Inc.,* 356 U.S. 525, 535, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); whether withholding the remedy would be outcome-determinative, *see York,* 326 U.S. at 109, 65 S.Ct. 1464; whether countervailing federal considerations exist, *see Byrd,* 356 U.S. at 537–38, 78 S.Ct. 893; and whether withholding the remedy would encourage forum-shopping or lead to the inequitable administration of the laws, *see Hanna v. Plumer,* 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

■ Under this analysis, it is clear that the equitable remedy provided by Section 7601 of confirming an appraiser's award, *see Penn Central Corp.,* 56 N.Y.2d at 128–30, 451 N.Y.S.2d 62, 436 N.E.2d 512 (1982), must be made available in this case. Such confirmation, as defined by the case law, is a remedy that is both inextricably entwined with the rights and obligations of the parties and potentially outcome-determinative. It is not only a mechanism for enforcing an appraisal agreement but also one that bears directly on the finality of any appraisal and on whether the parties are bound by it, factors with obvious potential to alter the outcome of many cases. *See Questrom v. Federated Department Stores, Inc.,* 41 F.Supp.2d 294, 302 & n. 55 (S.D.N.Y.1999) (noting that the availability of confirmation as a remedy implies that judicial review of an appraisal is "limited" and that an appraisal is "binding on the parties unless one of the grounds specified

in CPLR § 7511 is established"); *Penn Central Corp.,* 56 N.Y.2d at 130, 451 N.Y.S.2d 62, 436 N.E.2d 512 (noting that confirmation of an appraisal is subject only to the limited defenses that would preclude confirmation of an arbitral award).

Since the remedy of confirmation is both bound up with the rights of the parties and potentially outcome-determinative, only the strongest countervailing considerations would justify this Court in concluding that it was unavailable per se. Forbes, however, has identified no federal interest in denying the remedy outside of the interest in uniform federal practice that is arguably implicit in the doctrine of equitable remedial rights. This consideration does not justify the inequities inherent in creating a situation where the "accident" of diversity jurisdiction might produce a different outcome in a given case than would occur if the parties were required to proceed in the "state court a block away," *York,* 326 U.S. at 109, 65 S.Ct. 1464.

Accordingly, even if one were to assume, contrary to fact (*see supra*), that confirmation under Section 7601 is a remedy outside the traditional scope of federal equitable relief, the remedy must nonetheless be made available by this Court in a diversity case. *See Questrom,* 41 F.Supp.2d at 306–07 (appraisal in diversity action subject to confirmation, modification or vacatur under CPLR § 7601); *Clark v. Kraftco,* 323 F.Supp. 358, 361 (S.D.N.Y.1971) (holding, in a diversity action, that a court has discretion under CPLR § 7601 to grant or withhold confirmation of an appraisal).[6]

---

**6.** The Court is mindful of Forbes' alternative argument that a confirmation proceeding would be inappropriate even in state court because of the existence of other outstanding disputes between the parties that are pending in arbitration. However, while a Court has discretion to deny confirmation if doing so would lead to the resolution of all disputes in a single proceeding, *see Penn Central,* 56 N.Y.2d at 130, 451 N.Y.S.2d 62, 436 N.E.2d 512, dismissal of this confirmation petition

would not necessarily lead to such a result. Rather, because Cendant is not required to arbitrate the instant dispute, it could simply recast the action as one at law for breach of contract, leading once again to parallel proceedings between the same parties. Since withholding confirmation would not, therefore, necessarily result in all disputes being resolved in a single forum, the Court declines to exercise its discretion to dismiss this petition.

For the foregoing reasons, and those articulated by the Court at oral argument, *see* transcript, September 13, 1999, respondent's motion to dismiss or stay is hereby denied.

SO ORDERED.