Keating, J.
Petitioners Dimson, Berg and Feldman have applied for an order restraining arbitration attempted by Ataollah Elghanayan. Special Term denied the application. The Appellate Division, First Department, affirmed by a divided court.
The facts are somewhat complicated. For the sake of simplicity, the petitioners will be referred to as the “ BDF ” group. Respondent Ataollah Elghanayan and his two brothers, Nourollah and Aghadjan, will be referred to as the “ E ” group.
The BDF group, together with the E group (and in some instances with others), owned interests in eight separate enterprises involving the construction and operation of apartment buildings in New York City.
*320 There came a time when the two groups contemplated severing their partnership. Neither group, however, appeared to wish to entirely terminate its interest in the real estate which the groups owned.
Accordingly, they decided to “pair” several of the enterprises. The Elghanayans would set the value for each property in the “ pair ” and the BDF group would have the right to become the sole owner of whichever of the two properties it chose. The E group would become the sole owner of the other property in the “ pair ”. The group which acquired the property having the higher value, as fixed by the Elghanayans, would pay the difference in value to1 the other group. This cash payment may be referred to as “ boot ”.
The basic agreement which the parties entered into contains a description of each of the properties which they owned. Each of the parties owned shares in the various corporations which owned the real estate, and the number of shares which each owned is set out in the basic agreement. The agreement also provides for loans by shareholders to certain of the corporations, circumstances surrounding repayment, modifications of shareholders’ agreements and other provisions.
Paragraph 6 contains the provisions relating to the exchange of partnership interest, and the pairing of the properties referred to above. The only question before us involves the pairing of the two properties known as “57th Street” and “ 46th Street ”.
The agreement provides that the E group may serve the BDF group with a notice containing the E group’s valuation of each of these properties. The BDF group shall then give notice to the Elghanayans ‘ ‘ specifying the one of the 46th Street and • 57th Street partnerships of which the BDF Partners elect to become the sole partners ”. The agreement further provides that “ the Elghanayans shall become the sole partners of the other of said partnerships.” In addition, the agreement provides that any difference in the value of the two properties shall be adjusted by cash.
Paragraph 10 of the basic agreement contains an arbitration clause providing that “ Any dispute or controversy arising out of this agreement or relating to any term or provision hereof shall be submitted to arbitration in the City of New York in *321 accordance with, the rules then obtaining of the American Arbitration Association.”
The agreement would have proved effective to bring about the exchange of interests, but for the factor that Ataollah Elghanayan, the respondent herein, owned 5% of the two properties and his brothers owned 50%. Thus the E group’s interest was 55% and the BDF group’s interest in each property was only 45%.
Had the interest of each group been equal, the agreement would have provided for a foolproof exchange. The right of the E group to fix the values of the properties would have been counterbalanced by the BDF group’s right of selection.
However, the unequal interests of the two groups presented an opportunity for the Elghanayans to unfairly assign inordinately high values for each of the two properties.
A mathematical analysis demonstrates that, by increasing the value assigned to each of the properties, by one million dollars, the E group could increase the cash payment or “ boot ” payable to them from the BDF group by $100,000.
It seems clear that it was precisely to safeguard the BDF group, where the E group had this crucial 10% swing interest, that the supplemental agreement was executed.
The supplemental agreement, which was executed at the same time as the basic agreement, provides for an independent appraiser.
It lists five eminent real estate firms, stating that, from this list, one shall be selected, “ by agreement between the BDF Group and the Elghanayans, to appraise on a free and clear basis, the land, improvements, and personal property * * * located on and used in connection with the premises of each of 46th Street and 57th Street.”
The agreement further provides that, if the two groups are unable to agree to the selection of an apppraiser from the list by a certain date, the selection from the list shall be made by the President of the Real Estate Board of New York.
Paragraph (2) of the agreement provides that, after the appraiser renders a report of his appraisal, the Elghanayans * ‘ thereupon may * * * give notice to the BDF group * * * of their opinion of the values ” of the premises, as provided in the basic agreement,
*322 Were it not for paragraph (4), the agreement would thus far be difficult to comprehend. It would seem inconsistent to elaborately provide for appraisal by an independent firm, if the Elghanayans could then reject the independent appraisals and set their own values.
Paragraph (4) of the supplemental agreement resolves this difficulty. It provides that the amount of cash which shall be paid as 1 ‘ boot ’ ’ shall be computed in the following way:
(1) It shall be “ calculated on a fifty-fifty partnership basis, as if Ataollah Elghanayan were a BDF Partner, and on the basis of the values specified by the Elghanayans ”. (Italics supplied.) This first cash amount shall be referred to as *1 initial boot ’ ’.
(2) ‘1 If the initial hoot is payable to the BDF Partners it shall be reduced by the sum of (a) ten percent (10%) of the net value of the enterprise of which the BDF Partners have elected to become the sole partners computed on the basis of the value as reported by the appraiser pursuant to paragraph (1) hereof * * * and (b) ten percent (10%) of the initial boot payable to the BDF Partners.” (Italics supplied.) .
If the “initial boot ” is payable by the BDF partners, it shall be increased by the difference between 10% of the value of the premises of which the BDF partners have elected to become the sole partners, computed on the basis of the value as reported by the appraiser, and 10% of the “initial boot ” payable to the Elghanayans.
Thus, although the Elghanayans may fix values different from those of the independent appraiser, the agreement provides that, in computing the “boot” payable by reason of the Elghanayans’ 10% swing interest, the values “ as reported by the appraiser ” govern.
The petitioners thus make a convincing argument that the agreement evinces an over-all intention of protecting the BDF group from inequities which could very easily arise from the 10% swing interest which the Elghanayans had. Thus, the parties set up a procedure for an independent appraisal by an eminent real estate firm. The parties first agreed to each of the five firms on the list. Then it was provided that the President of the Beal Estate Board of New York could select the appraiser from the list, if the parties failed to agree on a selection.
*323 It is, therefore, clear from the agreement that the parties intended the appraisal values to be final “as to the 10% swing interest” as provided in paragraph (4) of the supplemental agreement. The freedom of the Elghanayans to adopt or reject the appraiser’s values did not apply to the 10% swing interest according to the clear language of the agreement.
Pursuant to the terms of this supplemental agreement, the real estate firm, Brown, Harris, Stevens, Inc., was selected by both groups to be the independent appraiser. It subsequently rendered appraisal reports appraising 57th Street at $3,450,000 and 46th Street at $3,400,000.
Thereafter, on July 1, 1966, the Elghanayans gave notice to the BDF group of their opinion of the value of the properties. They valued 57th Street at $4,818,000 and 46th Street at $4,518,000. It must be noted that this was strictly according to their rights under the agreements.
The E group’s attorneys, however, then sent a letter to the BDF group demanding arbitration with respect to the appraisals of these properties. , The BDF group applied for a stay of arbitration. This was denied and the denial has been affirmed by the Appellate Division. The court observed that paragraph (2) of the supplemental agreement provides that, after the appraisal, the Elghanayans may give notice of their values and, in so doing, may reject or adopt the values of the appraisers.
The court then states: “ [T]here is a lack of qualification or limitation upon the right of rejection.”
We are of the opinion that there is most certainly a qualification on the Elghanayans’ right to set their own values. Until paragraph (4) of the supplemental agreement is read, the whole procedure and selection of an appraiser appears superfluous, if the Elghanayans are then permitted unqualifiedly to fix their own values.
Paragraph (4) of the supplemental agreement is the key to its understanding. It provides that “initial boot ” shall be determined by the Elghanayans’ values and the “boot” payable by reason of the 10% swing interest shall be computed on the basis of the values “ as reported by the appraiser ”.
This much then is clear:
(1) The basic agreement’s provision permitting the Elghanayans to value the property unqualifiedly could very easily *324 operate to the BDF group’s prejudice by reason of the E group’s 10% swing interest.
(2) The supplemental agreement provides for the selection of an independent appraiser, but
(3) Nevertheless permits the Elghanayans to set their own values of the properties.
(4) Paragraph (4) directs that the Elghanayans’ values shall determine “ initial boot ” and the appraiser’s value shall determine the “ boot ” payable by reason of the 10% swing interest, thus safeguarding the BDF group from the possible inequity referred to in (1) supra.
Thus, when these agreements are read together, it is clear that the Elghanayans could not reject the appraiser’s values for all purposes as they propose to do.
As Justice Steuer stated in his dissenting opinion: “ [I]t could not be disputed that if the contract said in haec verba that the valuations of the appraiser were not subject to arbitration and were final and binding, that would not be subject to interpretation by the arbitrators * * * It is submitted that when these contracts are read and understood, this is exactly what was meant, and any differing interpretation would be unreasonable.”
Ordinarily, as we held in Matter of Exercycle Corp. (Maratta) (9 N Y 2d 329), where the parties have placed in their agreement a broad arbitration clause, all matters relating to the interpretation of that agreement are for the arbitrators to decide.
The presence of the appraisal provision in the supplemental agreement raises a unique problem which makes this case sui generis. Section 7601 of the CPLR empowers courts to ‘ ‘ enforce such an [appraisal] agreement as if it were an arbitration agreement ” and to treat the proceeding brought to effect its enforcement as one brought under the article (art. 75) relating to arbitration. In essence, then, the contract before us provides for two instances of arbitration.
It would be most unusual if parties to an agreement established co-ordinate tribunals to determine the same issue. Accordingly, the existence here of both appraisal and arbitration clauses gives rise to an issue of arbitrability, an issue which it is for the courts rather than the arbitrators to resolve. As *325 the Supreme Court wrote in Steelworkers v. American Mfg. Co. (363 U. S. 564, 570-571): “ Since arbitration is a creature of contract, a court must always inquire * * * whether the parties have agreed to arbitrate the particular dispute.”
In our view, the presence of the provision for fixation of values by the appraiser removed that subject from consideration by the arbitrator. In other words, the appraiser’s valuations were deemed by the parties to serve in this case the function which an arbitrator’s award fixing values would have served in another case. Under section 7601 a dissatisfied party who participated in the selection of an independent appraiser has no greater right to challenge the appraiser’s valuations than he would have to attack an award rendered by an arbitrator.
Since the appraiser’s valuations with respect to the Elghanayans’ 10% swing interest were intended to be final, the order for a stay of arbitration should be granted.
The petitioners have also asked us to confirm the appraisals. The original petition does not ask for this relief and, in any event, this is a discretionary procedure for the lower court to consider based upon all the factors (CPLR 7601).
The order of the Appellate Division should be reversed, with costs, and the case remanded to Special Term for appropriate relief in accordance with this opinion.
Chief Judge Fuld and Judges Van Voorhis, Burke, Scileppi and Bergan concur; Judge Brextel taking no part.
Order reversed, with costs in all courts, and case remitted to Special Term for further proceedings in accordance with the opinion herein.