Norman KATZ, Petitioner,

v.

Herbert FEINBERG, Respondent.

No. 99Civ.11705(CSH).

United States District Court,
S.D. New York.

April 11, 2001.

William B. Fleming, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., New York City, for petitioner.

Alan Heblack, Holland & Knight, L.L.P., New York City, for respondent.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This controversy has its genesis in the breakup of a long-enduring business partnership. The parties, formerly partners, now feud bitterly over the sale of one's interest in the business to the other. Disputes arose between them shortly after the sale and crystallized into claims including fraud, breach of fiduciary duty and breach of contract. These claims were brought before an arbitration panel in accordance with an arbitration clause in the governing Purchase Agreement. The arbitrators denied all of the claims and cross-claims except for petitioner Norman Katz's claim that the purchase price valuation was improperly calculated. Katz petitions this Court to confirm the arbitration award in its entirety pursuant to Section 9 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et al.[1] Respondent Herbert Feinberg cross-moves to partially vacate and modify the award pursuant to 9 U.S.C. §§ 10, 11. Because I conclude that the arbitrators exceeded their authority in analyzing and re-fashioning the valuation prepared by independent accountants selected by the parties, I grant Feinberg's motion to vacate that portion of the award. In all other respects, the award is confirmed.

### BACKGROUND

In 1976, Feinberg and Katz founded I. Appel Corporation ("I. Appel" or the "Company"), an apparel manufacturer. Each owned 50 percent of the common stock of the corporation, and their rights and obligations as shareholders were established by a Shareholders Agreement. Twenty years later, Feinberg agreed to purchase Katz's 50 percent interest in I. Appel. In connection with the buyout, the

---

1. Jurisdiction is based on diversity of citizenship.

parties entered into a Purchase Agreement dated June 20, 1996. The Purchase Agreement did not quantify a final pur-chase price. Instead, it provided that the purchase price would be equivalent to half of the net worth of the Company as of May 31, 1996, determined in accordance with Section 5.3 of the Shareholders Agreement by the Company's independent accountants. The agreement required that at closing Feinberg would pay Katz $6,149,370, which represented the "Estimated Share Purchase Price" ("ESPP") based on the Company's 1995 audited Financial Statements, adjusted by unaudited internal statements through April 30, 1996.

After closing, the ESPP was to be adjusted upward or downward based on the "Final Share Purchase Price" ("FSPP"), which was to be determined by Mahoney, Cohen, Rashba & Pokart, C.P.A., P.C. ("Mahoney, Cohen"), I. Appel's independent certified public accountants. Section 2(b) of the Purchase Agreement established the guidelines by which Mahoney, Cohen was required to determine the FSPP. Because this is the core provision around which this controversy swirls, it is worth reciting substantially in full. In this section the parties agreed that:

[Mahoney, Cohen] ... (the "Company Accountants") shall determine the net worth of the Company and the purchase price of the Shares in accordance with Section 5.3 of the Shareholders Agreement (as modified by this Agreement) as promptly as practicable following the Closing (*and in no event later than forty-five (45) days following the Closing*): In determining the net worth of the Company as of May 31, 1996, *the Company Accountants shall assume that the business practices of the Company in effect as of May 31, 1996, shall remain in effect* notwithstanding the consummation of the transactions contemplated by this Agreement. In valuing inventory as of May 31, 1996, the Company Ac-

countants are authorized to accept the quantities established in the inventory taken by the Company as of such date.... *No party to this Agreement shall hold substantive discussions or meetings with the Company Accountants relevant to the determination to be made pursuant to this Section 2(b) without giving the other parties prior notice of such proposed discussions or meetings and affording such other parties a reasonable opportunity to participate in such discussions or meetings; provided, however,* that any party may briefly answer factual questions from the Company Accountants without giving notice or affording participation rights to the other parties. Written communications to or from the Company Accountants relevant to such determination shall be provided to both Buyer and Seller. *The determination by the Company Accountants of the final purchase price of the Shares (the "Final Share Purchase Price") shall be final and binding on Seller and Buyer and shall not be subject to any appeal, arbitration, proceeding, adjustment or review of any nature whatsoever.* Promptly after determining the Final Share Purchase Price, the Company Accountants shall deliver to Seller and Buyer a written notice setting forth its determination of the Final Share Purchase Price (the "Determination Notice"). *The Determination Notice shall set forth in reasonable detail the basis for the Company Accountants' determination of the Final Share Purchase Price and shall explicitly state that the Company Accountants have reviewed the financial and accounting records of the Company and have determined the Final Share Purchase Price in accordance with such records, the provisions of Section 5.3 of the Shareholders Agreement and this Agreement.*

Purchase Agreement § 2(b) (emphases added.)

Section 5.3 of the Shareholders Agreement, to which the accountants were referred in calculating the FSPP, provides in relevant part that:

> In the determination of the net worth of the Corporation, such determination shall be made by the independent certified public accountants than [sic] employed by the Corporation in accordance with generally accepted accounting principles applied on a consistent basis....

The Purchase Agreement contained an arbitration clause binding the parties in relevant part as follows:

> (g) *Arbitration.* Except as provided in subsection (i) of this Section 14(g), all disputes under this Agreement, the Closing Date Promissory Note, the Final Promissory Note or the Pledge Agreement shall be settled by arbitration in New York, New York, before a panel of three arbitrators pursuant to the rules of the American Arbitration Association (the "Association"), but not under the auspices thereof.... Any award rendered by the arbitrators shall be conclusive and binding upon the parties hereto; *provided, however,* that any such award shall be accompanied by a written opinion of the arbitrators giving the reasons for the award. This provision for arbitration shall be specifically enforceable by the parties in the United States District Court for the Southern District of New York or the New York state courts in New York County, New York ... and the decision of the arbitrators in accordance herewith shall be final and binding and there shall be no right of appeal therefrom, except as otherwise provided by applicable law.

Section 14(g). The only exception to mandatory arbitration that the clause expressly references is contained in Section 14(g)(i) which provides that *"[T]o the extent arbitration may not be legally permitted hereunder* and the parties to any dispute hereunder may not at the time of such dispute mutually agree to submit such a dispute to arbitration either party may commence a civil action in a court of appropriate jurisdiction to resolve disputes hereunder." (emphasis added).

The closing under the Purchase Agreement took place on July 1, 1996. At closing, Feinberg paid Katz almost $3 million, representing loans Katz made to I. Appel, plus $1,537,342.50—one quarter of the Estimated Share Purchase Price. Feinberg executed a promissory note (the "Closing Date Promissory Note") for the remainder. The principal amount of the Closing Date Promissory Note was subject to automatic adjustment based upon the determination of the FSPP.

As directed by the Purchase Agreement, Mahoney, Cohen determined the FSPP based on its valuation of I. Appel's net worth as of May 31, 1996. On October 10, 1996 (beyond the 45–day post-closing deadline the Purchase Agreement called for), and as clarified on November 5, 1996, Mahoney, Cohen issued its conclusion that the FSPP represented a total of $1,859,879–far lower than the $6,149,370 Estimated Share Purchase Price. In its notice of determination, Mahoney, Cohen certified that it had "determined the Final Share Purchase Price ... in accordance with your directions set forth in Section 5.3 of" the Shareholders Agreement as modified by the Purchase Agreement.[2] The drastically reduced FSPP reflected to a large extent the significant downturn in I. Ap-

---

**2.** Neither party argues on the present papers that this recital did not satisfy the accountants' obligation to furnish a certification pur-suant to Section 2(b) of the Purchase Agreement.

pel's fortunes in 1996. Although the parties quibble over the extent to which overvalued inventory caused the losses and when the losses began, there is no doubt that I. Appel encountered considerable financial difficulties including grave losses and a cash flow crisis in 1996. In April of 1997, the Company filed for Chapter 11 bankruptcy protection from which it emerged a pared-down entity in May of 1998, after a $15 million debt writeoff.

The parties have engaged in efforts to avoid their obligations under the Purchase Agreement ever since Mahoney, Cohen issued its determination. Feinberg refused to pay Katz the remainder owed on the purchase price as required by the Purchase Agreement and the Closing Date Promissory Note, and sought, through arbitration, rescission of the Purchase Agreement and a refund of the purchase money already paid Katz. For his part, Katz sought to have the Mahoney, Cohen determination declared invalid—first by an unsuccessful state court motion to enjoin issuance of the determination, and then through arbitration.

Feinberg and Katz made separate demands for arbitration on May 7, 1997 (six days after I. Appel sought bankruptcy protection) asserting numerous claims, most of which are not at issue here. Feinberg principally claimed in arbitration that Katz fraudulently induced him to enter into the Purchase Agreement by providing false and misleading information which inflated the net worth of I. Appel in its audited 1995 financial statements and misrepresented the value of his loans to I. Appel, and that Katz also breached the Purchase Agreement in several respects. Feinberg sought rescission of the agreement or in the alternative a determination that he owed Katz only approximately $65,000 based on the Mahoney, Cohen determination of value. In his separate demand for arbitration, Katz sought enforcement of the Purchase Agreement and averred that the ESPP—not the lower FSPP—represented the actual purchase price of the Company because the latter determination was not conducted by Mahoney, Cohen in accordance with the requirements of the Purchase Agreement. Katz argued that Feinberg breached the Purchase Agreement by failing to pay him the balance of the ESPP due under the Promissory Note.

After eighteen months of discovery, a panel of three arbitrators conducted 18 days of hearings in the Spring and Summer of 1999. The panel issued its award in a 39-page written decision dated November 22, 1999. Most aspects of the arbitrators' award are not challenged by the parties and therefore need not be described in detail. It will suffice to say that the arbitrators denied all of Feinberg's claims for damages and rescission of the Purchase Agreement, and also denied Katz's claim for payment of the ESPP. Neither party, perhaps respecting the finality language of the arbitration clause, has asserted any basis for disturbing these aspects of the award. Instead, the present controversy centers around the panel's decision to revisit Mahoney, Cohen's determination of value and make its own adjustments to the FSPP.

In this regard, as an initial matter, the panel rejected Katz's argument that the ESPP should be regarded as the default final purchase price because the FSPP was not calculated in accordance with the procedural requirements set forth in Section 2(b) of the Purchase Agreement. The panel reasoned that the Purchase Agreement clearly indicated that the parties' intent was to make the ESPP only an estimated purchase price, not the default purchase price. The panel next concluded, without furnishing any analysis except to say that Feinberg had "conceded" the issue, that the language in Section 2(b) mak-

ing Mahoney, Cohen's determination of value "final and binding" did not prevent the arbitrators from ascertaining whether the purchase price determination had been conducted *"in accordance with the procedural requirements"* contained in the Purchase Agreement. Award at p. 27 (emphasis added).

Thus satisfied of its authority, the panel held that certain requirements of the pricing mechanism in the Purchase Agreement had been materially breached in the determination process. Specifically, the panel concluded that Section 2(b) was breached by the accountants' failure to issue a determination of value within 45 days of the closing, and that the raw materials markdown contained in the valuation had been affected by: (i) improper "ex parte" communications between Feinberg and the accountants; (ii) the accountants' failure to calculate the markdowns in accordance with GAAP; and (iii) the accountants' failure to assume that the business practices of I. Appel in effect as of May 31, 1996 concerning the markdown of inventory remained in effect after the purchase.

Having discerned those material breaches, the panel went on to conclude that it could fashion a remedy notwithstanding the language making the accountants' determination final. As the panel held, "[t]o construe the Agreement otherwise would render the procedural requirements meaningless." Award at 28. In the panel's view, construing the finality language in a way that would prevent it from adjusting the determination in the event of a breach failed to give meaning to the procedural limitations that were devised to guide the accountants' process of determination. To avoid such a disfavored construction of contractual terms, the panel instead "read the finality language to preclude challenges to determinations issued *in compliance with Section 2(b).* In this way, both that provision and the procedural require-

ments are given effect. First the parties' intent to prevent haggling over the valuation is retained, and second, the parties' strongly expressed intent for a determination produced pursuant to agreed-upon guidelines and procedures is respected." *Id.* at 28 (emphasis added).

The panel's chosen remedy was an upward adjustment of the FSPP calculation to "compensate Katz for the harm that has resulted from those breaches." Award at pp. 27–28. In the panel's view, the breaches would be remedied by reducing the amount of the markdowns the accountants made to two items of raw materials inventory—older trim (zippers, buttons, lace, etc.) and obsolete fabric. The panel's calculation resulted in a higher Company valuation, and a concomitant increase in the FSPP by $607,000. Based on this adjustment to the purchase price, the arbitrators concluded that the amount of unpaid principal plus interest on Feinberg's Promissory Note constituted $1,076,972. Their award directs Feinberg to pay Katz this amount plus nine percent interest to the extent it remains unpaid after December 1, 1999.

Katz's petition before this Court seeks to confirm the arbitration award in all respects. Feinberg's cross-motion seeks to vacate only the valuation aspect of the award pursuant to 9 U.S.C. § 10(a)(4) on the ground that the arbitrators "exceeded their powers," or alternatively, to correct it pursuant to 9 U.S.C. § 11(b) on the ground that the arbitrators awarded on a "matter not submitted to them." Feinberg does not challenge the arbitrators' denial of his claims for damages and rescission.

### DISCUSSION

The linchpin of Feinberg's argument is that the arbitrators lacked authority to recalculate the accountants' determination of the purchase price because the Purchase

Agreement made their determination "final and binding and [ ] not [ ] subject to any appeal, arbitration, proceeding, adjustment or review of any nature whatsoever." Section 2(b). The principal issue this Court must resolve in deciding the cross-motions is whether this language immunizes the accountants' determination of the final purchase price from arbitral scrutiny or modification. I conclude that it does, and consequently vacate that aspect of the award.

 "[A]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Dirussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir.1997) (internal quotations omitted). They are subject to vacatur only on the narrow grounds set forth in Section 10 of the FAA. The only ground relevant to this case allows a court to vacate an award "[w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(4). Courts may modify or correct an order in similarly limited circumstances. 9 U.S.C. § 11(b) allows a court to do so "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted." Courts must construe these provisions narrowly. *See Elite Inc. v. Texaco Panama Inc.*, 777 F.Supp. 289, 292 (S.D.N.Y.1991); *Blue Bell, Inc. v. Western Glove Works Ltd.*, 816 F.Supp. 236, 240 (S.D.N.Y.1993).

### 1. Standard of Review of Panel's Decision to Arbitrate Valuation

The arbitrators concluded that they had the authority to consider the propriety of Mahoney, Cohen's valuation and correct it if they thought it was wrong, as in fact they did in their award. To use the familiar shorthand, the arbitrators regarded any disputes regarding the procedures Mahoney, Cohen followed and the valuation they reached as *arbitrable* disputes under the contract between the parties. That construction was essential to the panel's award, since if these issues were not arbitrable, the arbitrators had no business considering them.

As a threshold matter, this Court must decide what standard of review it should apply to the arbitration panel's conclusion that it had the authority to consider the propriety of Mahoney, Cohen's valuation and to correct it. Although the parties do not directly address the issue in their briefs, Katz appears to suggest that this Court owes some deference to the panel's decision, whereas Feinberg contends that this Court must independently review the arbitrability question. The appropriate standard of review hinges upon whether the parties clearly agreed to have the arbitrators decide the question of the valuation dispute's arbitrability. I conclude that they did not.

 The determination of the scope of arbitration is ordinarily one for the Court to make. *See Blue Tee Corp. v. Koehring Co.*, 999 F.2d 633, 638 (2d Cir. 1993) (although district judge believed that "the scope of the AAA panel's arbitration was a matter for that panel to decide, we believe that under New York law, which the parties made applicable, it was an issue for court determination") (citation omitted); *Litton Financial Printing v. NLRB*, 501 U.S. 190, 208–209, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) ("Whether or not a company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court, and *a party cannot be forced to arbitrate the arbitrability question.*") (internal quota-

tions omitted; emphasis added). Thus, although an arbitrator's decisions on the merits of a dispute properly within its jurisdiction are accorded deference, *see, e.g., IBEW Local 97 v. Niagara Mohawk Power Corp.,* 143 F.3d 704, 713 (2d Cir. 1998) ("courts are not authorized to reconsider the merits of an arbitration award"), no deference is due an arbitrator's decision as to the scope of arbitrability unless the arbitrability question itself has been submitted by the parties to the arbitrator. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (if parties agreed to submit arbitrability question to arbitrators, court's standard of review is the same as when it reviews any other matter the parties have agreed to arbitrate; if not, court decides question independently).

▆▆ The question of who should decide whether a dispute is arbitrable "turns upon what the parties agreed about *that* matter." *First Options,* 514 U.S. at 943, 115 S.Ct. 1920 (emphasis in original). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944, 115 S.Ct. 1920 (alterations in *First Options* ) (quoting *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). In this regard, any silence or ambiguity about whether the parties have agreed to arbitrate arbitrability "reverses the usual presumption that issues should be resolved in [arbitration's] favor." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 241 F.3d 135, 146 (2d Cir.2001) (internal quotations omitted; citing *First Options,* 514 U.S. at 944–45, 115 S.Ct. 1920).

▆▆ In the present case, I conclude that neither the Purchase Agreement nor Feinberg's conduct evince a clear willingness to submit the arbitrability of the valuation dispute to the panel.

The arbitration clause and Section 2(b) of the Purchase Agreement are both silent about whether questions of arbitrability are within the province of the arbitrators. Under the presumption articulated by *First Options,* this factor militates against a finding that the panel had jurisdiction to determine the issue.

In its award, the panel stated that Feinberg had submitted for the panel's determination the "arbitrability of the methodology applied by Mahoney, Cohen" and had conceded that the panel was vested with the authority to determine whether the valuation had been conducted in accordance with the procedural requirements of the Agreement. Award at 27. However, the panel failed to cite to the relevant portions of the record from which it perceived these submissions or concessions by Feinberg. In my review of the record I have found no indication that Feinberg conceded that the panel had the authority to determine whether the valuation was properly conducted, or agreed, explicitly or implicitly, to submit that question of authority to the panel itself.

To the contrary, Feinberg's papers throughout the arbitration proceedings are replete with objections to the panel's jurisdiction to reconsider the valuation. For example, in his answer to Katz's arbitration demand, Feinberg gave an unqualified response only to Katz's contentions regarding the absence of Mahoney, Cohen's required certification and its failure to furnish the determination within 45 days of Closing. Feinberg then stated that "Katz's remaining challenges to the Final Share Purchase Price are not subject to arbitration," but that "[i]n the event that the Panel considers these arguments by Katz," he opposed them. Feinberg Exhibit ("FE") 6 at pp. 2–3. In his proposed conclusions of law, Feinberg continued to object to the panel's consideration of

Katz's procedural attacks on the valuation. Feinberg asserted that "despite [the Purchase Agreement's finality language], Katz has sought to collaterally attack the [determination of value] in a number of ways. *All such attacks are barred by the Finality Provision.* Assuming *arguendo* that the Panel has jurisdiction to adjudicate Katz's challenges to the conduct of the DOV, the Panel concludes that such changes [sic] lack merit." FE 2 at p. 94 (emphasis added).

By letter dated September 9, 1999, after conclusion of the hearings, the panel directed the parties to "assume":

> that neither the Estimated Share Purchase Price nor the final Determination of Value adopted by Mahoney Cohen may be a proper determination of "the purchase price of the Shares" within the meaning of the Purchase Agreement.

The panel then asked for submissions from the parties that would:

> specify for the Panel the mechanism that should be utilized in that case for arriving at a final share purchase price and the dollar figure that would be arrived at through application of that mechanism.

FE 7. In response to the panel's request, Feinberg reiterated that the "Purchase Agreement does not authorize the Panel to value the Company.... The parties specifically eliminated any third party valuation—whether by this Panel or any Court—by adopting the Finality Provision.... [A]ny valuation deviating from the DOV would exceed the scope of the Panel's authority." FE 8 at pp. 1–2. Arguing in the alternative, however, Feinberg maintained that "[i]f the Panel nonetheless were to conclude that it has the power to independently value I. Appel, the record overwhelmingly supports the [determination of value] as an appropriate net worth ceiling for the Company." *Id.* at p. 4.

■■■ Although Feinberg litigated the merits of the valuation dispute and presented evidence resisting Katz's challenges to the methods by which Mahoney, Cohen conducted its purchase price valuation, he only did so in the alternative, while always stating his threshold objection to the panel's ability to consider the issue. "[M]erely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.*, a willingness to be effectively bound by the arbitrator's decision on that point." *First Options,* 514 U.S. at 946, 115 S.Ct. 1920.

One simply cannot infer from the silent Purchase Agreement and Feinberg's positions during the arbitration either his concession to the panel's authority to determine the propriety of the valuation, or his agreement to furnish the panel with authority to decide the arbitrability of that issue. Feinberg's evident position was that the non-arbitrability of that matter was not in doubt and the panel had no business even considering whether Mahoney, Cohen followed the guidelines established by the Purchase Agreement in conducting its determination. As far as the Court is aware, Feinberg never deviated from that view. It would therefore be entirely illogical to conclude that Feinberg agreed to be bound by the arbitrators' decision as to whether the manner in which the valuation was conducted was arbitrable. Accordingly, because the parties did not clearly and unmistakably submit the issue of the arbitrability of the accountants' valuation to the panel, that question remains subject to this Court's independent review.

2. *Arbitrability of Valuation Dispute*

■■■ Because arbitration is a creature of contract, the arbitrability of an issue derives fundamentally from the par-

ties' agreement to arbitrate. Thus, the scope of the arbitrators' authority "depends on the intention of the parties to an arbitration, and is determined by the agreement or submission." *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987) (quoting 6 C.J.S. *Arbitration* § 67, 280–81 (1975)). "[T]he presumed authority of an arbitrator to resolve issues is broad, and courts expansively interpret the scope of an arbitrator's delegated authority by resolving doubts in favor of arbitrability." *Kozera v. Westchester–Fairfield Chapter of Nat'l Elec. Contractors Ass'n, Inc.*, 909 F.2d 48, 53 (2d Cir.1990).

The existence of an arbitration clause gives rise to a presumption that the parties intended to arbitrate a dispute "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 27 (2d Cir.1995) (internal quotations omitted). In deciding whether the parties intended to arbitrate a particular dispute the Court applies ordinary principles of contract interpretation. *See Mehler v. The Terminix Int'l Co. L.P.*, 205 F.3d 44, 48 (2d Cir.2000).

The arbitration clause in the Purchase Agreement at bar is broadly written. It provides, in relevant part, that "[e]xcept as provided in subsection (i) of this Section 14(g) [which allows civil litigation only to the extent arbitration may not be legally permitted hereunder"], all disputes under this Agreement, the Closing Date Promissory Note, the Final Promissory Note or the Pledge Agreement shall be settled by arbitration". Standing alone, this provision would presumably encompass the parties' dispute about the propriety of the valuation. In divining the parties' intent, however, the Court must not confine its interpretation to the arbitration clause but look to the contract as a whole, for although the parties may broadly agree to arbitrate they may also place limits on that arbitrability. Thus as the Second Circuit has cautioned, "[i]n determining whether a given dispute must be arbitrated the court looks to all terms of the parties' agreement bearing on arbitration. Even though the words of the agreement's arbitration clause may be broad, its scope may be limited by language elsewhere in the agreement clearly and unambiguously negating or limiting it with respect to a matter in dispute." *Woodcrest Nursing Home v. Local 144, Hotel, Hospital, Nursing Home and Allied Services Union*, 788 F.2d 894, 898 (2d Cir.1986); *see also Maryland Casualty Co. v. Benova*, No. 96 Civ. 4356, 1996 WL 363136, *2 (S.D.N.Y. June 28, 1996) ("All the terms of the agreement should be considered when determining whether a given dispute must be arbitrated."), *aff'd*, 107 F.3d 979 (2d Cir.1997).

Here, the arbitration clause must be read together with Section 2(b) of the Purchase Agreement which contains a finality provision manifestly excluding the accountants' purchase price determination from the consideration of arbitrators, or any review or modification whatsoever. The parties' intent with respect to arbitration is reflected by both of these provisions, and I conclude that the only plausible interpretation they allow is that the parties intended to exclude disputes concerning the valuation from the province of the arbitrators.

The exclusionary language of Section 2(b) is absolute and could not be more plain. It unambiguously indicates an intention to preclude arbitration over the validity of the valuation. It does not simply recite that the accountants' determination shall be final and binding; it further stresses that the final and binding determination "*shall not be subject to any appeal, arbitration, proceeding, adjustment*

*or review of any nature whatsoever."* (emphasis added). It contains no qualification or proviso, an absence that is revealing because the parties clearly knew how to include limitations on or exceptions to the final and binding nature of a decision when they intended to. For example, the arbitration clause in the Purchase Agreement requires that any arbitration award shall be "conclusive and binding" *"provided"* that any award be accompanied by a written opinion stating the arbitrators' reasons. It also states that the arbitrators' decision shall be "final and binding and there shall be no right to appeal therefrom, *except as otherwise provided by applicable law."* (emphasis added).

Katz urges the Court to follow the reasoning of the arbitration panel which reconciled Section 2(b)'s finality provision with its procedural requirements by concluding that the accountants' determination was final and binding only to the extent that it complied with those procedural requirements. I cannot countenance such an interpretation, however, because I believe it would essentially rewrite the parties' agreement to effect a limitation that is not passably implicit in the language. In sharp contrast to the arbitration clause which contains explicit limitations on finality, Section 2(b) does not include language to the effect that the determination is not subject to arbitration "so long as Mahoney, Cohen complies with the procedural requirements of this Section". Yet, this is just how Katz's argument would require me to construe it.

The arbitrators reasoned, and Katz contends, that such a limitation must be read into the finality provision in order to avoid rendering superfluous the procedural requirements guiding the accountants' determination—a result which would run afoul of the cardinal principle of contract interpretation that "all provisions of a contract should be given effect if possible."

*State of New York v. Oneida Indian Nation of New York,* 90 F.3d 58, 63 (2d Cir.1996). I disagree. It is not necessary to contrive such an interpretation to ensure that the procedural restrictions retain significance. The specifications Mahoney, Cohen were directed to follow in performing its valuation do not become meaningless simply because the accountants' valuation process is not subject to review. Those guidelines still exist, but they were for Mahoney, Cohen to apply. Indeed, Mahoney, Cohen was required to, and did, certify that they conducted the determination in accordance with them. Under the terms of the Agreement, it was left to Mahoney, Cohen to ensure that it had complied with the requirements—to police itself, as it were. This is the procedure that the parties' agreement devised. Its careful structure, ceding the valuation determination to accountants and rendering that determination final and immune from review, unravels if Mahoney, Cohen's valuation is subject to tampering after review by an arbitration panel. That sort of scrutiny runs contrary to the obvious purpose of Section 2(b), which is to place the complicated financial determination into the expert hands of the Company's long-time accountants within agreed upon guidelines which the accountants must certify were followed.

Because I "cannot close [my] eyes to the plain meaning of the words used," *Woodcrest Nursing Home, supra,* 788 F.2d at 898 (internal quotation omitted), I cannot accept Katz's contention that the accountants' valuation is subject to arbitral review. The finality provision could not be more clear. Allowing for modification of the determination, even under the narrow circumstances contemplated by the arbitration panel (i.e., only if it is not conducted in *compliance* with the Agreement), undermines it. In view of the plain language of the finality provision, I simply do

not believe that a fair interpretation of the contract allows for arbitration of the methodology of the valuation or a remedy which alters it. I conclude that the parties' intention was for the valuation to be *conclusive* and that no other interpretation is plausible.

Although each contract and set of factual circumstances is unique and therefore no other case is precisely on point, several decisions applying New York law[3] and holding that determinations pursuant to independent appraisal provisions were not subject to arbitration furnish useful guidance.

The parties to *American Silk Mills Corp. v. Meinhard–Commercial Corp.*, 35 A.D.2d 197, 315 N.Y.S.2d 144 (1st Dep't 1970), entered into a purchase agreement providing that inventory would be valued by the seller's accountants, but that if the buyer's accountants did not agree with the valuation it would be referred to a third accounting firm with the latter firm's determination to be "final and binding on the parties". The purchase agreement also contained a general arbitration clause providing that "any dispute between the parties under this agreement" must be settled by arbitration. No exception was carved out for inventory disputes. Inevitably, a dispute arose and the seller made a demand for arbitration. The Appellate Division stayed the demand, concluding that the parties' intention was to refer the matter to independent accountants for appraisal and therefore arbitration was "prematurely maintained and *not authorized.*" *Id.* at 148 (emphasis added). The court recognized the general principle that:

> [A]lthough parties have broadly agreed to the arbitration of any dispute arising under a contract, they may limit such agreement by also providing that, inde-

pendent of the arbitration agreement, the value of the property involved in a particular contracted for transaction shall be fixed by appraisers. In such case, the courts are empowered to 'enforce such an [appraisal] agreement as if it were an arbitration agreement' and to treat the proceeding brought to effect its enforcement as one brought under CPLR, article 75, relating to arbitration.

*Id.* at 147 (quoting *Dimson v. Elghanayan*, 19 N.Y.2d 316, 324, 280 N.Y.S.2d 97, 102, 227 N.E.2d 10 (1967) (alteration in *Dimson*)). In determining the parties' intent, the touchstone of arbitrability, the court held that:

> Here, it was expressly provided that the inventory valuation fixed by the third accounting firm was to be 'final and binding on the parties for the purposes of this Agreement', and upon reading the contract as a whole, we conclude that the parties intended to remove that particular matter from consideration by an arbitrator.

315 N.Y.S.2d at 147.

The New York Court of Appeals case that *American Silk* quoted also addressed an appraisal provision co-existing with a broad arbitration clause. In *Dimson v. Elghanayan, supra,* 19 N.Y.2d 316, 280 N.Y.S.2d 97, 227 N.E.2d 10, the parties severed their partnership pursuant to an agreement that allowed one group of partners to set the values of certain properties owned by the partnership and the other group to become the sole owner of the properties it selected. The main agreement contained a broad arbitration clause requiring arbitration of "[a]ny dispute or controversy arising out of this agreement or relating to any term or provision hereof". *Id.* at 320, 280 N.Y.S.2d 97, 227

---

3. The Purchase Agreement at bar calls for the application of New York law to disputes arising thereunder.

N.E.2d 10. A supplemental agreement called for an independent appraiser to determine the value of each property but allowed the first group of partners to provide their "opinion of the values" set by the arbitrators. *Id.* at 321, 280 N.Y.S.2d 97, 227 N.E.2d 10. Based on the clear language of the agreement, the Court of Appeals held that although the agreement allowed the first group of partners to establish different values for the properties than those set by the appraiser, this freedom did not apply to the appraiser's determination of the "10% swing interest" owned by that group because the agreement provided that the amount payable based on that 10% was to have been "computed on the basis of the value as reported by the appraiser". *Id.* at 322, 280 N.Y.S.2d 97, 227 N.E.2d 10. In the Court's view, "the whole procedure and selection of an appraiser appears superfluous, if the Elghanayans are then permitted unqualifiedly to fix their own values." *Id.* at 323, 280 N.Y.S.2d 97, 227 N.E.2d 10.

Having determined that the appraiser's valuation with respect to the 10% swing interest was intended to be final, the Court concluded that it was not subject to arbitration and stayed the arbitration demanded by the first group. With reasoning germane to the instant case, the Court declared that:

> The presence of the appraisal provision in the supplemental agreement raises a unique problem which makes this case *sui generis.* Section 7601 of the CPLR empowers courts to "enforce such an [appraisal] agreement as if it were an arbitration agreement".... *In essence, then, the contract before us provides for two instances of arbitration. It would be most unusual if parties to an agreement established co-ordinate tribunals to determine the same issue.* Accordingly, the existence here of both appraisal and arbitration clauses gives rise to an issue of arbitrability, an issue which

it is for the courts rather than the arbitrators to resolve.... In our view, the presence of the provision for fixation of values by the appraiser removed that subject from consideration by the arbitrator.

*Id.* at 324–25, 280 N.Y.S.2d 97, 227 N.E.2d 10 (second emphasis supplied; alteration in original).

In another case involving an agreement which placed a valuation determination in the hands of accountants, a court in this district protected the accountants' valuation from arbitral review. *Whirlpool Corp. v. Philips Electronics, N.V.*, 848 F.Supp. 474 (S.D.N.Y.1994) (Sweet, *J.*), addressed a dispute between the parties to a purchase agreement over the valuation of a portion of the seller's assets. The purchase agreement contained a provision governing disputes over the seller's financial statements which required the parties, in the event of disagreement, to refer the matter to an independent accounting firm and to instruct them "to follow PHILIPS' Accounting Policies in resolving any disputed matters." *Id.* at 476. The independent accountants' determinations were expressly made "final and binding" on the parties. The agreement also contained an arbitration clause which, unlike the arbitration clause in the instant case, specifically exempted disputes concerning the financial statements governed by the former provision.

Unable to agree on certain aspects of the financial statements, the parties duly submitted their dispute to Arthur Andersen & Co., which resolved the particular dispute at issue in Whirlpool's favor. In opposing Whirlpool's motion to confirm the award, Philips argued that Andersen had no authority to resolve the dispute because it involved a legal question and sought instead to have it resolved by an arbitration panel pursuant to the general arbitra-

tion clause in the purchase agreement. The court disagreed, concluding that:

> courts which have previously considered this question have generally held that contracts with provisions providing for accounting arbitration of financial statements, such as this one, should be broadly construed to cover all disputes but for those which are expressly excluded.... In this case, there is a specific provision for resolving this dispute—that is § 4.4 of the RPA—which requires that 'final and binding' arbitration concerning financial statements be conducted before Andersen.... [I]t would be both uneconomical and judicially imprudent to submit this dispute to still further arbitration under [the arbitration clause].

*Id.* at 479.

Noting that the "plain language" of the agreement—including the provision requiring the accountants to determine financial statement disputes and the exclusion of such disputes from the purview of the arbitration clause—indicated that the parties had intended that the dispute at issue would be governed by the accountants' determination, Judge Sweet observed that: "it appears that Philips may not in good faith first fully participate under § 4.4 which purports to be a 'final and binding' process, only to turn around, in wake [sic] of an outcome with which it disagrees, and assert its alleged rights of 'appeal' under [the arbitration clause]." *Id.* at 479–80.

Another court in this district recently held that a broad arbitration clause in the defendant's employment agreement did not cover a dispute concerning expense overcharges which were the subject of a supplemental agreement by which the defendant agreed to "remit to the Company any overcharge the Audit Committee [of the Board of Directors] determines exists". *Cendant Corporation v. Forbes,* 70 F.Supp.2d 339, 341 (S.D.N.Y.1999) (alteration in original) (Rakoff, *J.*), *aff'd without published opinion,*205 F.3d 1322 (2d Cir. Jan. 28, 2000). After the Audit Committee calculated the overcharge amount, the employee initiated arbitration seeking a declaration that he need not pay that amount. The court granted the corporation's motion to stay arbitration. Judge Rakoff concluded that the Audit Committee's determination was not subject to arbitration primarily because the arbitration clause covered only disputes "which cannot be settled by mutual agreement" and the overcharge dispute had been "settled" by virtue of the supplemental agreement. *Id.* at 342. Although this precise holding is not relevant because the arbitration clause at bar does not contain similar limiting language, the court's reasoning concerning the parties' intent has a broader application and forcefully resonates here. Judge Rakoff recognized, as do I in the case at bar with respect to Mahoney, Cohen's determination, that:

> [T]o require Cendant to arbitrate in the face of the Audit Letter would run contrary to the letter's obvious purpose, which was to submit the question of improperly reimbursed expenses to a group of appraisers—the Audit Committee—in lieu of arbitration. *When parties enter into an agreement to submit an otherwise arbitrable question to an appraiser, it is logical to conclude that, by entering into the appraisal agreement, they intend to remove the question from the range of arbitrable matters and to be bound by the appraiser's findings. Dimson v. Elghanayan,* 19 N.Y.2d at 324–25, 280 N.Y.S.2d 97, 227 N.E.2d 10. Here, no other interpretation of the Audit Letter is plausible. To contend, as Forbes does, that he retained the right to arbitrate despite his unequivocal promise (in plain and simple language drafted by his own counsel) the

he "will remit to the Company any overcharge the Audit Committee determines exists with respect to my expense items" ... is to argue that "will" really means "might," that "Audit Committee" really means "arbitrator," ... and that the Audit Letter is essentially meaningless. The force of reason would be weak indeed if it succumbed to such sophistry. *Id.* at 342–43 (first emphasis added).

While none of these cases is precisely on point, they collectively demonstrate a marked respect for appraisal agreements that appear to place valuation determinations within the exclusive realm of the appraisers, and a disposition in favor of enforcing the parties' intent to make such determinations final and therefore not subject to an arbitration clause that might otherwise govern the dispute.

In the present case, a conclusion that the Mahoney, Cohen valuation is final and binding *only if* subsequent arbitral or judicial review reveals that the cited procedural requirements were followed would directly contradict the provision's language that the determination would not be "subject to any appeal, arbitration, proceeding, adjustment or review *of any nature whatsoever.*" (emphasis added). Endorsing the panel's review of the determination methodology would require precisely the sort of exercise in sophistry eschewed by the *Cendant* court—i.e., "final" does not really mean "final" it means "final, *so long as it is determined in accordance with this agreement.*" That interpretation would run contrary to the parties' obvious intent to establish a mechanism for a valuation to be determined by independent accountants which remained free from outside review. To allow arbitrators to scrutinize and adjust the valuation performed by Mahoney, Cohen pursuant to the authority vested in them by the Purchase Agreement would make the finality aspect of the provision, and perhaps even the parties' decision to delegate the determination to the outside accountants, essentially meaningless.

The Second Circuit recognizes the effect of unequivocal contractual provisions for the finality of dispute resolution. That is evidenced by *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 n. 3 (2d Cir.1999), which cited with apparent approval *In re Chromalloy Aeroservices,* 939 F.Supp. 907 (D.D.C.1996). In *Chromalloy* a military procurement contract with the Egyptian Air Force provided for the arbitration of all disputes before a "court of arbitration" in Cairo, and further provided that "[t]he decision of the said court shall be final and cannot be subject to any appeal or other recourse." Notwithstanding that provision for finality, the Egyptian government, the party disappointed by the arbitration award, sought and obtained from the Egyptian Court of Appeal a judgment nullifying the award, and then pleaded that judgment in bar to the winning party's petition in the United States district court to enforce the arbitration award. The district court enforced the award, reasoning that Egypt, by appealing the arbitration award to the Egyptian court, "seeks to repudiate its solemn promise to abide by the results of the arbitration," in breach of the contractual agreement that "the arbitration ends with the decision of the arbitral panel." 939 F.Supp. at 912. In *Baker Marine,* the Second Circuit reiterated the *Chromalloy* court's condemnation of Egypt for seeking "to repudiate its solemn promise to abide by the results of the arbitration," and distinguished *Chromalloy* from *Baker Marine* on the facts because "Chevron and Danos did not violate any promise in appealing the arbitration award within Nigeria." 191 F.3d at 197 n. 3.

That analysis is instructive in the case at bar, because the parties in their contract promised that the company accountants' of

the final purchase price of the shares "shall be final and binding on Seller and Buyer and shall not be subject to any appeal, *arbitration,* proceeding, adjustment or review of any nature whatsoever" (emphasis added). Katz must "repudiate that solemn promise" to obtain a review by the arbitrators of the accountants' valuation. The Court will not allow him to do so, or allow the arbitrators to abet him in the effort.

■ "[A]n arbitration board exceeds the scope of its authority when it modifies, rewrites, or holds contrary to 'clear and unambiguous contractual language.'" *CSX Transportation, Inc. v. United Transportation Union, F.A.,* 765 F.Supp. 797, 808 (W.D.N.Y.) (internal quotations omitted), *rev'd on other grounds,* 950 F.2d 872 (2d Cir.1991). Having concluded that the parties did not intend to allow for arbitral review of Mahoney, Cohen's valuation determination, it follows inexorably that the arbitration panel exceeded the scope of its authority by reviewing and refashioning that valuation. Accordingly, I hold that the portion of the award relating to that valuation must be vacated and that the Mahoney, Cohen determination of value must stand. Feinberg's motion to partially vacate the arbitration award is granted. Feinberg is directed to pay Katz the remaining purchase price based on the Mahoney, Cohen valuation pursuant to the terms of the Closing Date Promissory Note.

### 3. *Feinberg's Claim for Setoff*

■ Feinberg contends that he has a contractual right to withhold from any amount he owes Katz under the award the sum of money Katz owes him for certain litigation expenses that the parties agreed to split evenly pursuant to Section 8(d) of the Purchase Agreement. Feinberg derives this right from Section 11 of the Purchase Agreement, which purports to entitle Feinberg to setoff any amount Katz owes Feinberg under Section 8(d) from any amount Feinberg owes Katz under the Closing Date Promissory Note. Feinberg has demanded a total of $435,000 from Katz for his share of the litigation expenses and Mahoney, Cohen's fee for conducting the valuation. Katz disputes his obligation to pay this amount and in November of 1999 Feinberg filed a separate arbitration seeking payment of it. The Court is not aware whether that arbitration has been concluded.

■ The Court will not become enmeshed in this setoff dispute. This case was brought as a petition to confirm an arbitration award. As such, this Court's role is limited to reviewing the parties' challenges to the arbitrator's decision. As Katz points out, "[a]ctions to confirm arbitration awards ... are straightforward proceedings in which no other claims are to be adjudicated." *Ottley v. Schwartzberg, supra,* 819 F.2d at 377 (quoting *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 176 (2d Cir.1984) ("[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.") (citation omitted)). Feinberg's setoff claim is not addressed anywhere in the award and, indeed, was not even a subject of the underlying arbitration. Katz's obligation to pay the amount that Feinberg wishes to setoff is contested and the issues underlying that asserted obligation are the subject of a separate arbitration proceeding. In light of the limited nature of this proceeding, the setoff issue is not properly before this Court.

### 4. *Interest*

■ At page 37, paragraph 4 of their award, dated November 22, 1999, the arbitrators fixed the Final Share Purchase Price at $2,466,879, leaving Feinberg with

an unpaid principal balance under the Closing Date Promissory Note of $929,536. The arbitrators then made that amount the touchstone of their calculation of interest, deriving the rate from the Closing Date Promissory Note, namely, "the prime rate of interest minus 1% computed based on a 360 day year of 12 thirty (30) day months." *Id.* The arbitrators awarded Katz interest at that rate on that amount from July 1, 1996 through November 30, 1999. The arbitrators further included in their award the direction that if the award remained unpaid 14 days after its delivery to the parties' counsel, "interest shall accrue and be paid [by Feinberg] thereon at the legal rate of nine percent per annum from December 1, 1999 to the date of payment." *Id.*

On these cross-motions, neither party challenges the arbitrators' authority to award prejudgment interest or their calculation of the rates, so this Court has no occasion to consider those questions. However, the Court is granting Feinberg's cross-motion to vacate the award, to the extent that the Court reinstates the Mahoney, Cohen valuation of the Final Share Purchase Price, namely, $1,859,879. Accordingly interest for the period July 1, 1996 through November 30, 1999 must be recalculated, based upon that lower gross amount. Similarly, the arbitrators' award of interest at the rate of 9% per annum from December 1, 1999 will not be disturbed, although of course it will be upon a lower principal sum than that contemplated by the award.

Once this Court enters judgment on the award in an amount consistent with this Opinion, postjudgment interest until the date of payment will be calculated in accordance with the provisions of 28 U.S.C. § 1961.

## CONCLUSION

For the reasons discussed above, the Court grants Feinberg's cross-motion to partially vacate the arbitration award dated November 22, 1999. The Court vacates only that portion of the award that concluded that the Mahoney, Cohen valuation determination was made in violation of certain procedural requirements of the Purchase Agreement and adjusted the amount of the Final Share Purchase Price as a result. In all other respects, including the direction regarding the payment of interest, the arbitration award is confirmed.

Settle an Order and Judgment consistent with this Opinion on ten (10) days' notice within thirty (30) days of the date of this Opinion and Order.

The foregoing is SO ORDERED.